# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

**MARC M. DULCIO,**

　　　　　*Plaintiff,*

*vs.*　　　　　　　　　　　　　　　**CASE NO.** 22-cv-81908-AMC

**See Attached**

　　　　　*Defendants.*

_____/

FILED BY _MEE_ D.C.

DEC 08 2022

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

# COMPLAINT

**COMES NOW** the Plaintiff, Marc M. Dulcio, representing himself as a Pro Se litigant, sue the Defendants; ENVIRONMENTAL PROTECTION AGENCY, FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION, ARCADIS U.S., INC., GPI PROPERTIES, INC., EARTH TECH DRILLING, INC., STACI KICHLER, JASON ANDREOTTA, SIRENA DAVILA, NORVA BLANDIN, ALANNAH IRWIN, ROMINA LANCELLOTTI, AARON COHEN, GARY BALLARD, JUSTIN STARK, SHAWN HAMILTON, THERESA PEPE, BRECK DALTON, MICHAEL S. REGAN, SARAH HAWLEY, OYEPERO OLOWU, and LATESHEE M. DANIELS as the result of retaliation, discrimination, negligence, and violations of the United States Constitution by the defendants, for which Mr. Dulcio seeks declaratory relief, and damages.

CASE NO. _____

# **ATTACHED**

## **Full List of Defendants**

1.) ENVIRONMENTAL PROTECTION AGENCY;

2.) FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION;

3.) ARACDIS U.S.,INC.;

4.) GPI PROPERTIES, INC., d/b/a Groundwater Protection;

5.) EARTH TECH DRILLING, INC.;

6.) STACI KICHLER (Individual Capacity);

7.) JASON ANDREOTTA (Individual Capacity);

8.) SIRENA DAVILA (Individual Capacity);

9.) NORVA BLANDIN (Individual Capacity);

10.) ALANNAH IRWIN (Individual Capacity);

11.) ROMINA LANCELLOTTI (Individual Capacity)

12.) AARON COHEN (Individual Capacity);

13.) GARY BALLARD (Individual Capacity);

14.) JUSTIN STARK (Individual Capacity);

15.) SHAWN HAMILTON (Individual Capacity);

16.) THERESA PEPE (Individual Capacity);

17.) BRECK DALTON (Individual Capacity);

18.) MICHAEL S. REGAN (Individual Capacity);

19.) SARAH HAWLEY (Individual Capacity);

20.) OYEPERO OLOWU (Individual Capacity);

21.) LATESHEE M. DANIELS (Individual Capacity).

# TABLE OF CONTENTS

Jurisdiction ............................................................................................. *3*

Venue ..................................................................................................... *3*

References .............................................................................................. *3*

Parties ................................................................................................. *4-9*

Factual Allegations ............................................................................ *10-25*

**COUNT I - DECLARATORY RELIEF**
(*Mr. Dulcio vs. FDEP & Arcadis*) ........................................................ *26-27*

**COUNT II - DECLARATORY RELIEF**
(*Mr. Dulcio vs. FDEP, Manager2, & Inspector1*) ................................... *28-29*

**COUNT III - GROSS NEGLIGENCE**
(*Mr. Dulcio vs. Arcadis*) ..................................................................... *30-34*

**COUNT IV - ACTION FOR DAMAGES (Chapter 376 Fla. Stat)**
(*Mr. Dulcio vs. Arcadis, Groundwater Protection, & EarthTech*) ............... *35-37*

**COUNT V - DEPRIVATION OF RIGHTS (*1st Amendment*)**
(*Mr. Dulcio vs. Inspector1 & FormerAgent1*) ........................................ *38-40*

**COUNT VI - DEFAMATION (Libel)**
(*Mr. Dulcio vs. Director1, Manager2, & Inspector1*) .............................. *41-43*

**COUNT VII - FRADULANT CONCEALMENT**
(*Mr. Dulcio vs. Arcadis*) ..................................................................... *44-48*

**COUNT VIII - CONSPIRACY to Interfere w/ Civil Rights (*13th Amendment*)**
(*Mr. Dulcio vs. Director2, Manager2, Inspector1, FormerAgent1, & Counsel1*) ........... *49-54*

**COUNT VIV - ACTION FOR NEGLECT TO PREVENT**
(*Mr. Dulcio vs. EPA-ADMINISTRATOR1, SECRETARY1, COUNSEL2, PROGRAMDIRECTOR1, CONTRACTMANAGER1, FDEP-SECRETARY, EPA-AGENT1 & EPA-AGENT2*) .......................................................... *55-57*

**COUNT X - DEPRIVATION OF RIGHTS (8th Amendment)**
(*Mr. Dulcio vs. Director1, Manager2, Inspector1, & Counsel1*) ................ *58-59*

**COUNT XI - DEPRIVATION OF RIGHTS (*Fla. Stat. 376.3078(3)(a)*)**
(*Mr. Dulcio vs. Director1, Director2, Manager2, Inspector1, and Counsel1*) ............... *60-61*

**COUNT XII - ACTION FOR CORRECTIVE ACTION...**
(*Mr. Dulcio vs. EPA & FDEP*) ............................................................. *62-66*

SUMMARY OF LOSSES/DAMAGES ................................................... *67-68*

RELIEF ................................................................................................. *69*

# JURISDICTION

1.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 as this is a Civil Rights Claim under 42 U.S.C § 1983; and pursuant to 28 U.S.C. § 1367, which gives the district courts supplemental jurisdiction over state law claims.

# VENUE

2.      Venue is proper in this judicial district under 28 U.S.C. § 89(c) as the events that gave rise to this Complaint occurred in this District.

3.      Venue is further made proper in Palm Beach County, Florida as the incident(s)/act(s)/omission(s) occurred and accrued in Palm Beach County, and Defendants operate business and/or a governmental agency and/or reside and/or work in Palm Beach County, Florida.

4.      This is an action seeking damages in excess of $100,000 exclusive of costs, and interest.

# REFERENCES

A.)     FDEP_BaseSite/"INITIAL SITE ASSESSMENT WORK PLAN"
B.)     FDEP_BaseSite/"B. LINN COMMENTS SITE ASSESSMENT WORK PLAN"
C.)     FDEP_BaseSite/"SITE ASSESSMENT REPORT"
D.)     FDEP_BaseSite/"FDEP DALTON - SITE ASSESSMENT REPORT"
E.)     FDEP_BaseSite/"SUPPLEMENTAL SITE ASSESSMENT REPORT"
F.)     FDEP_BaseSite/"SUPPLEMENTAL ASSESSMENT REPORT"
G.)     FDEP_BaseSite/"FDEP DALTON-SUPPLEMENTAL SITE ......"
H.)     FDEP_BaseSite/"ATTEMPT TO CONDUCT INSPECTION...."
I.)     FDEP_BaseSite/"SITE PHOTOS"

**"FDEP_BaseSite"**
(https://prodenv.dep.state.fl.us/DepNexus/public/electronicdocuments/ERIC_5194/facility!search)

# PARTIES

5.      Plaintiff, Marc M. Dulcio (hereinafter, "**Mr. Dulcio**"), at all times material hereto, **Mr. Dulcio** was an individual residing in Palm Beach, Florida and is *sui juris*, **Mr. Dulcio** is the single member owner of Warranty Repair Experts, LLC (hereinafter, "WRX") d/b/a New Lifestyle Cleaners (hereinafter, "**LSC**") which is properly registered and domiciled in Florida.

6.      **Mr. Dulcio** operating as the Manager/Operating Manager of WRX, transferred all rights, interests and cause of actions to himself, in his individual/personal capacity.

7.      **Mr. Dulcio** performed a business conversion *(Pursuant to F.S. 605.1045)* of his LLC to a Sole proprietorship exposing **Mr. Dulcio** to personal liability, and further enabling Mr. Dulcio to pursue this matter in his individual and/or personal capacity as a "Pro SE" litigant (*pursuant to 28 U.S.C. § 1654*).

8.      **Defendant (1),** Environmental Protection Agency (hereinafter, "**EPA**"), has a duty to protect human health and the environment, the **EPA** have several offices throughout the state of Florida, including in the Southern District of Florida.

9.      **Defendant (2),** Florida Department of Environmental Protection (hereinafter, "**FDEP**"); The Department is the administrative agency of the State of Florida having the power and duty to protect Florida's air and water resources

and to administer and enforce the provisions of Chapter 403 and 376, Fla. Stat., and the rules promulgated thereunder in Fla. Admin. Code Title 62.

10.     The **FDEP** of the South-East District (hereinafter, "**FDEP-SED**") is a sub-division of the **FDEP** operating with all the same powers and duties of the **FDEP**, and at all times material hereto, conducts business, and has an office located at 3301 Gun Club Road in West Palm Beach, Florida with a zip code of 33406.

11.     **Defendant (3),** ARCADIS U.S., INC. (hereinafter, "**Arcadis**") at all times material hereto, was authorized to do business in the state of Florida *(Active Certificate of Authorization #GB564)* and was doing business in the State of Florida through its office in Highland Ranch, Colorado and registered agent in Boynton Beach , Florida. The nature of Arcadis's business is design, engineering, and consultancy solutions for natural and built assets.

12.     **Defendant (4),** GPI PROPERTIES, INC., d/b/a Groundwater Protection, a division of DrillPro, LLC. (hereinafter, "**Groundwater Protection**"), is a Florida limited liability company properly registered and domiciled in Florida, and conducts business from its principal address in Orlando, Florida, The nature of **Groundwater Protection's** business is to provide specialized environmental drilling services.

13.     **Defendant (5),** EARTH TECH DRILLING, LLC. (hereinafter, "**EarthTech**"), is a Florida Corporation properly registered and domiciled in

Florida, with an office located in Pompano Beach, Florida, The nature of **EarthTech's** business is to provide professional drilling services.

14.  **Defendant (6),** STACI KICHLER (hereinafter, "**Counsel1**"), is employed with the **FDEP** *(General Counsel Office)* as Legal Counsel, and at all times material hereto, was "operating under the color of law", and whose duties involve serving the interest of **FDEP**, while upholding the law.

15.  **Defendant (7),** JASON ANDREOTTA (hereinafter, "**Director1**"), is employed with the **FDEP-SED** as District Director, and at all times material hereto, was "operating under the color of law", and whose duties were to provide guidance and oversight to all program areas in the south east district.

16.  **Defendant (8),** SIRENA DAVILA (hereinafter, "**Director2**"), is employed with the FDEP-SED as Assistant Director, and at all times material hereto, was "operating under the color of any law", and whose duties were to coordinate the compliance functions.

17.  **Defendant (9),** NORVA BLANDIN (hereinafter, "**Manager1**"), is employed with the **FDEP-SED** as Environmental Manager, and at all times material hereto, was "operating under the color of law", and whose duties were to oversee the district's Permitting and Waste Cleanup programs.

18.  **Defendant (10),** ALANNAH IRWIN (hereinafter, "**Manager2**"), is employed with the **FDEP-SED** as Environmental Manager, and at all times material hereto, was "operating under the color of law", and whose duties were to oversee the district's Permitting and Waste Cleanup programs.

19.     **Defendant (11),** ROMINA LANCELLOTTI (hereinafter, "**Inspector1**"), is employed with the **FDEP-SED** as Environmental Manager, and at all times material hereto, was "operating under the color of law", and whose duties were to oversee the district's Permitting and Waste Cleanup programs.

20.     **Defendant (12),** AARON COHEN (hereinafter, "**ProgramDirector1**"), is employed with the FDEP as a Program Director, and at all times material hereto, was "operating under the color of law", and whose duties were to oversee the Drycleaner Solvent Cleanup Program.

21.     **Defendant (13),** GARY BALLARD (hereinafter, "**Counsel2**"), is employed with the FDEP as Lead Counsel, and at all times material hereto, was "operating under the color of law", and whose duties were to oversee the members of the Office of General Counsel.

22.     **Defendant (14),** JUSTIN STARK (hereinafter, "**FormerAgent1**"), was employed with the FDEP as an Environmental Specialist, and at all times material hereto, was "operating under the color of law", and whose duties were to provide compliance assistance.

23.     **Defendant (15),** SHAWN HAMILTON (hereinafter, "**Secretary1**"), is employed with the FDEP as Deputy Secretary, and at all times material hereto, was "operating under the color of law", and whose duties were to provide statewide guidance on sensitive environmental justice issues and was

appointed as the principal state liaison for the U.S. Environmental Protection Agency's Office of Environmental Justice.

24.   **Defendant (16),** THERESA PEPE (hereinafter, "**ContractManager1**"), is employed with the FDEP as a Contract Manager with a Florida Certified Contract Manager Certification *(#4547-21122),* and at all times material hereto, was "operating under the color of law", and who duties were to oversee monitor and provide guidance to contracts, and contractors.

25.   **Defendant (17),** BRECK DALTON (hereinafter, "**ProgramPG1**"), is employed with the FDEP under the Waste Site Cleanup Section as a Professional Geologist, at all times material hereto, was "operating under the color of law", and who duties were to aide **ContractManager1** with site characterization and providing technical assistance to contractors.

26.   **Defendant (18),** MICHAEL S. REGAN (hereinafter, "**EPA-Administrator1**"), is employed with the EPA as "The EPA Administrator", at all times material hereto, was "operating under the color of law", and who is responsible for managing and enforcing the nation's environmental laws and regulations, preparing the annual budget of the agency, leading U.S. government efforts related to the environment at home and abroad, and other responsibilities.

27.   **Defendant (19),** SARAH HAWLEY (hereinafter, "**EPA-AGENT1**"), is employed by the EPA (region 4 office) as a Program Lead, and at all times material hereto, was "operating under the color of law", and who is responsible for leading the EPA programs of region 4.

28.   **Defendant (20),** OYEPERO OLOWU (hereinafter, "**EPA-AGENT2**"), is employed by the EPA (region 4 office) as Lead Enforcement, and at all times material hereto, was "operating under the color of law", and who is responsible for the enforcement actions within EPA region 4.

29.   **Defendant (21),** LATESHEE M. DANIELS (hereinafter, "**FDEP-SECRETARY**"), is employed with the FDEP as an administrative secretary, and at all times material hereto, was "operating under the color of law", and who is responsible for providing high-end clerical support for high-end officials at the FDEP office located in Tallahassee, FL.

# FACTUAL ALLEGATIONS

30.     **Mr. Dulcio** owned and operated three (3) LSC dry cleaners. The main facility was located at 2565 Forest Hill Blvd, West Palm Beach, Florida with a zip code of 33406 (hereinafter, "**LSC-Plant**"). The **LSC-Plant** is registered with the **EPA** with an **EPA** ID number of **FLD981029168**, and with the **FDEP** with a site ID of **ERIC_5194**.

31.     **Mr. Dulcio** second dry cleaning operation known as "New LifeStyle Cleaners (Coral Springs)" (hereinafter, "**LSC-DropOff-1**"), which was located at 10878 Wiles Road, Coral Springs, Florida with a zip code of 33076.

32.     **Mr. Dulcio** third dry cleaning operation known as "New LifeStyle Cleaners (Miami)" (hereinafter, "**LSC-DropOff-2**") which was located at 18978 NW 2nd Ave, Miami Gardens, Florida with a zip code of 33167.

33.     The **LSC-DropOff-1** and **LSC-DropOff-2** were solely dependent on **LSC-Plant** for all its fabric cleaning needs.

34.     On November 2014, Forest Hills RE Investments, LLLP (hereinafter, "**FHRI**") purchased the strip mall that **LSC-Plant** is housed in.

35.     The **LSC-Plant** site exist within the Biscayne Sole Source Aquifer as described in 40 U.S.C. § 149.2(d).

36.     Prior to December 2017, **FDEP** assigned the **LSC-Plant** site to Arcadis to perform the "Initial Site Assessment" (hereinafter, "**ISA**"), the Senior

Scientist for the task was Douglas J. McGlone, and the Principal Hydrogeologist was William D. Vogelsong.

37.     On December 7, 2017, **Arcadis** performed the **ISA** at the **LSC-Plant** site, and on December 13, 2017, **Arcadis** submitted the **ISA** to the **FDEP** for review. *(please see "Reference A")*

38.     On January 5, 2018, **FDEP** employee Bill Linn on comment #3 request that ground penetrating radar be used to locate the drain field, and on comment #4 states that it is their (**FDEP**) belief that the site is utilizing city water and sewer. *(please see "Reference B")*

39.     Ground penetrating radar (hereinafter, "**GPR**") plays an integral part by providing a non-intrusive means of examining the subsurface for environmental hazards such as soil contamination, underground storage tanks and drums. The key to a comprehensive environmental assessment is the subsurface investigation.

40.     The most effective way for **Arcadis** to identify the drain field *(per Bill Linn's comments)*, would be to identify the pipes leading to, and from the septic tanks.

41.     Prior to December 2018, the **FDEP** assigned the **LSC-Plant** site to **Arcadis** to perform the Site Assessment Report (hereinafter, "**SAR**"), not to be confused with the **ISA**.

42.    Prior to December 2018 **Arcadis** subcontracted the services of Groundwater Protection to perform the drilling at the **LSC-Plant** site.

43.    Prior to December 3, 2018, Arcadis hired a private utility locate service company, "Ground Penetrating Radar Services, Inc" *(This company could not be found within the SunBiz database),* To perform an Electromagnetic Induction (hereinafter, "**EM**"), and a **GPR** survey of the **LSC-Plant** site.

44.    From December 3, 2018 to January 11, 2019 Arcadis along with the services rendered by its subcontractors performed the site assessment at the LSC-Plant site.

45.    On February 1, 2019, Arcadis submits their **SAR** to the **FDEP** for review, Per Figure 3 of Arcadis's **SAR** no underground pipes leading to and from the septic tank was identified. The only underground utility identified was the natural gas (hereinafter, "**NG**") line, which commences at the westside fence of the strip mall *(The westside fence runs parallel to Forest Hill Blvd.),* the NG line leads north, until it reaches the rear of the building, then veers east *(similar to an "L", or a hockey stick)* until it reaches the gas meter located directly behind the Dry Cleaners next to the Boiler. *(please see "Reference C")*

46.    The **LSC-Plant** site <u>does</u> utilize city water, but <u>does not</u> utilized city sewer. Therefore it was **Arcadis's** obligation and/or responsibility and/or duty to ensure that all pipes leading to and from the septic tanks, at the **LSC-Plant** site

be identified, and marked prior to drilling; this process is known as pre-drilling

clearance/potholing/daylighting and is a mandatory prerequisite per the **FDEP**

SOP–17.

47. Per **FDEP** SOP-17; *"[T]he standard practice is to post hole or hand*

*auger to a depth of four feet to verify that the location is clear of utilities. The*

*Contractor should obtain copies of blueprints or as-built drawings before*

*beginning work on-site. These should be readily available for recently constructed*

*facilities."*

48. On April 23, 2019 **ProgramPG1** created a memorandum and

submitted it to **ContractManager1** *(please see "Reference D"),* key take aways from

the comment/recommendation section:

> ***a.*** *(#3) [T]hat department engineers consider "Interim Source*
>
> *Removal".*
>
> ***b.*** *(#14) Arcadis recommends consideration of additional soil*
>
> *sampling and an excavation. They also recommend considering*
>
> *SVE using MAGS wells to remediate soil. It is true that there*
>
> *appears to be insufficient soil data to proceed with excavation. Soil*
>
> *sampling did not identify significant soil contamination,* ***but***
>
> ***MAGS test results indicate a very significant remaining***

*vadose zone source. It may be feasible that an interim source removal (ISR) using SVE could be implemented without the need for further soil sampling. Department engineers should consider remedial strategies for the site and, then, determine whether additional soil sampling is warranted.*

    <u>*c.*</u> *(#16) The SAR can be revised/resubmitted and additional assessment completed as supplemental site assessment.*

49.    On May 9, 2019, **Arcadis** resubmitted the **SAR** with the recommended corrections to the **FDEP** for review.

50.    On June 6th, 2019 **Mr. Dulcio** purchased the **LSC** business and equipment from the property owner **FHRI**, then signed a lease agreement to lease the LSC-Plant site for 5 years.

51.    On or about July 25th 2019, employees of the **FDEP** performed a Compliance Evaluation Inspection at the **LSC-Plant** site.

52.    The inspection was conducted by **Manager2, Inspector1**, and an unknown member of the **FDEP, Mr. Dulcio** was present for this inspection.

53.    Prior to November 1, 2019, **Mr. Dulcio** completed all needed repairs and corrected all active **FDEP** violations in order to be in compliance and to begin operating the LSC business.

14

**54.**     On September 9, 2020, **Arcadis** returned to the **LSC-Plant** site and

began drilling for 2 new wells, one inside of the **LSC-Plant** building and the

other outside, on the next day September 10, 2020, **Arcadis** started collecting

groundwater samples.

**55.**     On November 11, 2020 **Arcadis** submits their "Supplemental Site

Assessment Report" to the **FDEP** for review. *(please see "Reference E")*

**56.**     On December 18, 2020, **Arcadis** returned once again to the **LSC-**

**Plant** site to collect additional/confirmatory groundwater samples.

**57.**     On January 8, 2021, **Arcadis** submits their "Supplemental

Assessment Report" to the FDEP for review. *(please see "Reference F")*

**58.**     On March 25, 2021 (a total of 1 year and 7 months from when

**Arcadis** performed the **ISA**, and after **Arcadis** has completed the **SAR**),

**ProgramPG1** submitted a memorandum to **ContractManager1** *(please see*

*"Reference G"),* key take away;

> **_a._**  *(#1) Our initial site assessment found significant contamination at the*
> *site, but the PCE concentration in MW003 was 1,680 ug/l in January*
> *2019 and was 72,600 ug/l in September 2020. Likewise, the PCE*
> *concentration in sediment from the septic tank was 0.21 mg/kg in*
> *December 2018 and 963 mg/kg in September 2020.*

**_b._** *(#7) Pending resolution of potential compliance issues and whether the facility is or will be an active drycleaner, site data appear to warrant remediation. If the drycleaner is not or will not be an active drycleaner in the near future, I recommend that department engineers consider an Interim Source Removal and clean-out of the septic tank.*

59.     On April 13, 2021, an unknown person entered into **LSC-Plant** site and demanded to do an inspection, **Mr. Dulcio** was not on-site at the time of the unknown persons arrival, but Morana Hilaire (hereinafter, **"SiteManager1"**) was there and advised the unknown person that he would have to first speak with **Mr. Dulcio** to ensure that this was ok, the unknown person did not present any credentials to **SiteManager1**.

60.     **SiteManager1** called **Mr. Dulcio** and advised **Mr. Dulcio** that there was a person there attempting to conduct an inspection. **Mr. Dulcio** stated that he was not aware of any inspections and asked to speak with the unknown person.

61.     **Mr. Dulcio** informed the unknown person that he wasn't aware of any inspection and if she could reschedule this **"inspection"** for another date and time. The unknown person advised **Mr. Dulcio** that the property owner signed a site access agreement which he would be in violation of if **Mr. Dulcio** did not grant her access. **Mr. Dulcio** acknowledged what the unknown person said, and

requested a few minutes in order for **Mr. Dulcio** to call the property owner Bill

Sahni (hereinafter, "**PropertyOwner1**"), in hopes of gaining clarity as to who this

unknown person was, and if the property owner was okay granting this

unknown person site access.

62.     **Mr. Dulcio** made several calls, along with sending text messages to

the **PropertyOwner1**, but was not successful. **Mr. Dulcio** called **SiteManager1**,

and requested to speak with the unknown person; **Mr. Dulcio** informed the

unknown person of his inability to reach **PropertyOwner1** and re-requested for

the inspection to be rescheduled, or if the unknown person could wait or come

back later in the afternoon, to allow **Mr. Dulcio** time to commute to the **LSC-**

**Plant** site from where he was at that moment (**Miami**).

63.     The unknown person became very irate and began to threaten **Mr.**

**Dulcio** with violations, fines, and criminal charges of obstructing justice, **Mr.**

**Dulcio** requested that the unknown person clam down and grant him just a few

more minutes to contact the **FDEP** in hopes of gaining a better understanding as

to who this person was.

64.     The unknown person became even more irate and began insulting

**Mr. Dulcio** in front of **SiteManager1**, by referring to **Mr. Dulcio** as Mr. Sucio

(This is a Spanish word that means unclean/dirty/disgusting), Mr. Dulcio

demanded that the unknown person cease calling him Mr. Sucio, and that he would be calling the **FDEP**.

65.    **Mr. Dulcio** ended the call and called the only number he had for the **FDEP** but was greeted by a voicemail box. **Mr. Dulcio** had no other choice but to compose an email to the **FDEP** requesting assistance with this matter. While **Mr. Dulcio** was composing the email **SiteManager1** texted **Mr. Dulcio** advising him that the unknown person said she would come back later in the afternoon around 4 pm. To conduct the inspection with **Mr. Dulcio** on-site, **Mr. Dulcio** responded; Ok.

66.    **Mr. Dulcio** left from where he was in Miami and begin commuting to **LSC-Plant** site located in the city of West Palm Beach, Florida to meet with the unknown person at 4 p.m. before **Mr. Dulcio** got to the **LSC-Plant** site the **PropertyOwner1** called **Mr. Dulcio** advising him that the unknown person was an employee of the **FDEP** and to please grant her access next time she comes.

67.    **Mr. Dulcio** advised **PropertyOwner1** that; He (**Mr. Dulcio**) will make sure all of his employees are aware of the potential of a surprise inspection. **Mr. Dulcio** also advised **PropertyOwner1** that he will compose an email apologizing to the **FDEP**, and ensuring them that they won't have to worry about delays in site access in the future.

68.    **Mr. Dulcio** composed the email and sent it to the **PropertyOwner1,**
**Manager2,** and **Inspector1,** in the email **Mr. Dulcio** apologized for the
misunderstanding/miscommunication and stated that all of his employees are
aware of the potential of a surprise inspection and that the **FDEP** will not have
an issue with site access anymore.

69.    **Manager2** responded with additional threats of violations, fines,
fees, and civil liabilities for the current instance and if ever site access is not
granted in the future.

70.    On April 16, 2021, **Inspector1** returned to the **LSC-Plant** site and
performed an inspection at the **LSC-Plant** site. As a result of the inspectors
report Mr. Dulcio was placed in "non-compliance" status. *(please see "Reference I")*

71.    **Manager2** created an email chain and advised **FHRI,** and **Mr.**
**Dulcio** that **LSC-Plant** is in "non-compliance" status and is eligible for program
termination from the **Drycleaner Solvent CleanUp Program**.

72.    This information made the property owner very upset with **Mr.**
**Dulcio,** causing the property owner to threaten to evict **Mr. Dulcio** if he doesn't
correct the violations that has caused the site to be in "non-compliance" status.

73.    On or about February 5, 2021, **FHRI** entered into an agreement to
sell the property to Highrange, Inc., (hereinafter "**HRI**").

74.     **HRI** received a commitment letter from **Truist Bank** on February 25, 2021, for the purchase of the property from **FHRI**.

75.     On or about May 22, 2021, **Truist bank** informed **HRI** that it "could not rely upon the property as collateral", due to the site being in a non-compliance status with the **FDEP**.

76.     Prior to July 1, 2021 **Mr. Dulcio** completed all corrections requested by the **FDEP-SED** in order to return to compliance and continue operating his business.

77.     When **Mr. Dulcio** contacted the **FDEP-SED** to confirm if they were in receipt of his pictures, proving that he has complied with their demands, **Manager2** advised **Mr. Dulcio** that the **FDEP-SED** was in receipt of his picture, and to grant the **FDEP** sometime to review the photos and information, **Manager2** concluded her email by stating that the department had 300 days to review the information.

78.     This response made **PropertyOwner1** very upset causing **PropertyOwner1** to demand the keys for **LSC-Plant** site, and informed **Mr. Dulcio** that his lease contained a clause making it mandatory to be in compliance with all federal, state and local laws, and due to **Mr. Dulcio** "non-compliance", **FHRI** must evict him.

79.     **Mr. Dulcio** begged **PropertyOwner1** to reconsider,
**PropertyOwner1** said he wouldn't. **Mr. Dulcio** then asked if he could please sell
the business to generate money, due to **Mr. Dulcio's** wife being pregnant, with
an expected delivery date of August 10, 2021.

80.     **PropertyOwner1** said he will grant **Mr. Dulcio's** request to sell the
business, but also requested if **Mr. Dulcio** could please fix the "non-compliance"
issue, or at least figure out what was going on, **Mr. Dulcio** gave
**PropertyOwner1** his word that he would sort this matter out.

81.     **Mr. Dulcio** tried to sell the **LSC business** prior to his eviction date
of November 1, 2021, but all prospective buyers rescinded their offers after
discovery of the "non-compliance" status of the **LSC-Plant** site.

82.     Due to **Mr. Dulcio's** non-compliance status with the **FDEP**, **Mr.
Dulcio** was in direct violation with the terms and conditions of his lease
agreement with **FHRI** which consequently was the direct cause for **Mr. Dulcio's**
eviction from the **LSC-Plant** site (On Nov 1, 2021).

83.     Due to **Mr. Dulcio's** eviction, **Mr. Dulcio** lost possession of the **LSC-
Plant** site and all of his dry cleaning equipment, which performed all of his fabric
cleaning for **LSC-Plant**, **LSC-DropOff-1**, and **LSC-DropOff-2**.

84.     Due to the loss of **LSC-Plant**, **Mr. Dulcio** was unable to perform the work needed to sustain the **LSC-DropOff-1**, and **LSC-DropOff-2** sites, and was forced to return the keys to the owners of both properties.

85.     Due to **Mr. Dulcio**'s non-compliance status **Mr. Dulcio** lost his government contracts, which required him to be in compliance with all state laws, local laws, statutes, and ordinances.

86.     Due to **Mr. Dulcio**'s non-compliance status, **Mr. Dulcio** lost his exclusive textile restoration contract with a reputable water restoration company that services the entire state of Florida.

87.     Due to **Mr. Dulcio** non-compliance status **Mr. Dulcio** was not able to apply for a series of additional government as well as private business contracts.

88.     **Mr. Dulcio** is an "**American with Disabilities**" as described in 42 U.S.C. § 12102(1a)&(1b), Mr. Dulcio was tested and diagnosed as having  a learning disability (Reading, Learning, and Concentrating) once in 1993, and again in 1997 as a student in the Miami-Dade county public school system.

89.     After being left destitute by the loss of income and subsequent loss of businesses on the heels of the birth of **Mr. Dulcio's** last child, **Mr. Dulcio** was determined to become competent in environmental science, geology, and hydrology for the purpose of figuring out why **FDEP** and **Arcadis** was unable to

figure out the true cause of the spike in **COC** at the **LSC-Plant** site and decided to research this matter for himself **Mr. Dulcio** started by reviewing the **ISA**, and the **SAR's** that were submitted by **Arcadis**. After fully reviewing and reading the **ISA**, and **SAR's Mr. Dulcio** called Arcadis employee Douglas J. McGlone (hereinafter, "**Douglas**") in hopes of gaining clarity on a series of discrepancies **Mr. Dulcio** found within **Arcadis's SAR**.

90.     As **Mr. Dulcio** began to ask **Douglas** questions about the discrepancies, **Douglas** appeared to become a bit agitated and began to divert the conversation by saying; "Those things don't matter, the real problem is they have a black business owner that didn't give them access. He's basically digging his own grave."

91.     This statement shocked **Mr. Dulcio** because **Mr. Dulcio** has never met **Douglas**, it was at that moment **Mr. Dulcio** realized that;

        **a.**  **Douglas** was not aware of who he was speaking to on the phone;

        **b.**  That some of the difficulties that **Mr. Dulcio** was dealing with, with the **FDEP** may have been racially motivated.

92.     On December 1, 2021, The **FDEP** issued **Mr. Dulcio** an **Official Notice of Potential New Discharge**.

93.     On February 10, 2022, the **FDEP** issued **Mr. Dulcio** an **Official Notice of Violation** (The first step in an Administrative Proceeding).

94.     On May 4th 2022, **Mr. Dulcio** was made aware of a criminal investigation that was opened against him by the **FDEP**.

95.     **Mr. Dulcio** asked the **FDEP**, what initiated the criminal investigation. The **FDEP** replied that the September 10th 2020, sampling event along with consultation from **Arcadis** were their basis for launching a criminal investigation into **Mr. Dulcio**.

96.     On May 18, 2022, the **FDEP** acquired a search warrant with **Mr. Dulcio**'s name on it, and with the assistance of 10 police officers began to search the former **LSC-Plant** site.

97.     On July 5, 2022, **Mr. Dulcio** gave notice to the **FDEP, EPA, DSCP,** and **WSCS** that the **LSC-Plant** site was a "Dense Non-Aqueous Phase Liquid" (hereinafter, "**DNAPL**") site as described in Florida Administrative Code 62-780.200(20).

98.     Due to the misdiagnosis of the former **LSC-Plant** site, the site was subsequently mishandled by **Arcadis, EarthTech,** and **Groundwater Protection** causing the spike in **COC** that was found in the groundwater samples dated September 10, 2020.

99.     On July 7, 2022, an independent firm was contracted (Alpha-Omega Training and Compliance (hereinafter, "**AOTC**")), to perform confirmatory sampling of the former **LSC-Plant** site, during the sampling event the contractor

determined that the site was indeed a **DNAPL** site and that a new discharge by **Mr. Dulcio** was not possible given the evidence.

100.   To date the **FDEP** has an Open/Active Civil, and criminal investigation on **Mr. Dulcio**, both investigations have generated hardships for **Mr. Dulcio**, **Mr. Dulcio** has been forced to forego a series of gainful investments, business opportunities, and employments, which resulted in **Mr. Dulcio** suffering mental, emotional, and economical losses both known and unknown and an inability to provide for himself and his family.

# COUNT I
## DECLARITORY RELIEF
28 U.S.C. § § 2201-2202
*Vs.* (FDEP & ARCADIS)

**101.**    Plaintiff reiterates and hereby incorporates the allegations contained in paragraphs 1 through 100 as if stated fully and further alleges as follows:

**102.**    This is a cause of action against **FDEP**, and **Arcadis** (hereinafter, "**Count1Defendants**"), pursuant to the Declaratory Judgement Act, 28 U.S.C. §§ 2201-2202.

**103.**    This court has the authority and jurisdiction to order the declaratory relief sought by **Mr. Dulcio** in this matter.

**104.**    **Mr. Dulcio** is in doubt as to whether he, and/or **FDEP**, and/or **Arcadis** is the responsible party/parties pursuant to Fla. Stat 376.308(2) for the new discharge or other condition of pollution covered by Sections 376.30 through 376.317, Fla Stat. at the **LSC-Plant** site.

**105.**    **FDEP**'s duty to the public is to protect Florida's soil, water, and air.

**106.**    **Arcadis**'s contractual duties to FDEP and by extension **Mr. Dulcio** is to provide professional services with an emphasis on the quality of care, and not to further contaminate the **LSC-Plant** site.

**107.**    Due to **Count1Defendants**'s breach of duty, conflict of interest, and potential criminal and civil liabilities associated with the determination of who

the responsible party may be; it is clear that neither can be dependent upon for an unbiased determination.

108.    As a direct and proximate result of this controversy **Mr. Dulcio's** rights, liberties, protections, and freedom have been threatened, hindered as well as infringed upon.

**WHEREFORE**, Plaintiff, **Mr. Dulcio** respectfully requests a declaratory judgement pursuant to 28 U.S.C. §§ 2201-2202, declaring **FDEP** and/or **Arcadis** as the responsible parties pursuant to 376.3078(2) Fla. Stat., and if possible an exoneration for **Mr. Dulcio** or the benefits of limitation of liability of future action brought against the **LSC-Plant** site as a result of the new discharge or other condition of pollution, along with expert witness fees, on the grounds that such an award is in the public interest, and any further relief as the Court deems proper.

# COUNT II
## DECLARITORY RELIEF
### 28 U.S.C. § § 2201-2202
*vs. (FDEP, MANAGER2 & INSPECTOR1)*

**109.**   Plaintiff reiterates and hereby incorporates the allegations contained in paragraphs 1 through 100 as if stated fully and further alleges as follows:

**110.**   This is a cause of action against **FDEP**, **Manager2**, and **Inspector1** (hereinafter, **"Count2Defendants"**) pursuant to the Declaratory Judgement Act, 28 U.S.C. §§ 2201-2202.

**111.**   This court has the authority and jurisdiction to order the declaratory relief sought by **Mr. Dulcio** in this matter.

**112.**   **Mr. Dulcio** is in doubt as to whether violations that were issued to him (**Mr. Dulcio**) by the **FDEP** on July 25, 2019, April 16, 2021, and December 1, 2021 are with merit and/or accurate/true.

**113.**   The **FDEP**, and by extension its employees (**Manager2**, and **Inspector1**) have a duty to the public to protect Florida's soil, water, and air, and above all to honor the law, and their oath of office.

**114.**   **Mr. Dulcio** has made numerous attempts to resolve this matter, but have not received cooperation from **Count2Defendants**.

115.    As a direct and proximate result of this controversy **Mr. Dulcio's** rights, liberties, protections, and freedom have been threatened, hindered as well as infringed upon.

**WHEREFORE**, Plaintiff, **Mr. Dulcio** respectfully requests a declaratory judgement pursuant to 28 U.S.C. §§ 2201-2202 declaring which violations/claims were proper/true, and which violations/claims were not proper/false against **Count2Defendants**, along with expert witness fees, on the grounds that such an award is in the public interest, and any further relief as the Court deems proper.

# COUNT III
## GROSS NEGLIGENCE
### 768.72(2)(b) Fla Stat.
#### *vs. (ARCADIS & GROUNDWATER PROTECTION)*

116.   Plaintiff reiterates and hereby incorporates the allegations contained in paragraphs 1 through 100 as if stated fully and further alleges as follows:

117.   **566.102 Fla. Stat.** definitions pertinent to **Count III;**

(3) **"Damage"**: means any impact upon or contact with, including, without limitation, penetrating, striking, scraping, displacing, or denting, however slight, the protective coating, housing, or other protective devices of any underground facility, or the removal or weakening of any lateral or vertical support from any underground facility, or the severance, partial or complete, of any underground facility.

(6) **"Excavate"** or **"excavation"**: means any manmade cut, cavity, trench, or depression in the earth's surface, formed by removal of earth, intended to change the grade or level of land, or intended to penetrate or disturb the surface of the earth, including land beneath the waters of the state, as defined in s. 373.019(22), and the term includes pipe bursting and directional drilling or boring from one point to another

point beneath the surface of the earth, or other trenchless technologies.

(10) **"Member operator":** means any person who furnishes or transports materials or services by means of an underground facility.

(12) **"Person":** means any individual, firm, joint venture, partnership, corporation, association, municipality, or other political subdivision, governmental unit, department, or agency, and includes any trustee, receiver, assignee, or personal representative of a person.

(16) **"Underground facility"**: means any public or private personal property which is buried, placed below ground, or submerged on any member operator's right-of-way, easement, or permitted use which is being used or will be used in connection with the storage or conveyance of water; sewage; electronic, telephonic, or telegraphic communication; electric energy; oil; petroleum products; natural gas; optical signals; or other substances, and includes, but is not limited to, pipelines, pipes, sewers, conduits, cables, valves, and lines.

118.   556.106 Fla. Stat. states;

**(2)(a)** If a person violates s. 556.105(1) or (6), and subsequently, whether by himself or herself or through the person's employees, contractors, subcontractors, or agents, performs an excavation or demolition that damages an underground facility of a member operator, **it is rebuttably presumed that the person was negligent. The person, if found liable, is liable for the total sum of the losses to all member operators involved as those costs are normally computed. Any damage for loss of revenue and loss of use may not exceed $500,000 per affected underground facility,** except that revenues lost by a governmental member operator whose revenues are used to support payments on principal and interest on bonds may not be limited.

**(2)(b)** If any excavator fails to discharge a duty imposed by this chapter, the excavator, **if found liable, is liable for the total sum of the losses to all parties involved as those costs are normally computed. Any damage for loss of revenue and loss of use may not exceed $500,000 per affected underground facility,** except that revenues lost by a governmental member operator whose revenues are used to support payments on principal and interest on bonds may not be limited.

**119.** This action arises from work performed between December 3, 2018 to January 11, 2019 at the **LSC-Plant** site by defendant **Arcadis & Groundwater Protection** (hereinafter, "**Count3Defendants**") for the **FDEP**.

*120.* Per the **FDEP** SOP-17, it was the responsibility of **Count3Defendants** to perform a utility clearance of the areas where monitoring wells would be developed, prior to drilling.

**121.** **Count3Defendants** breached their duties by not performing a proper underground survey prior to drilling, causing **Count3Defendants** to puncture (during drilling, and well development) the inlet, and possibly the outlet pipes of the on-site septic tanks (Underground Facility).

**122. As a direct and proximate cause of Count3Defendants gross negligence the inlet pipe leading to the septic tank**

**123.** As a direct and proximate cause of the Gross Negligence **Mr. Dulcio** suffered damages in the form of; damages to a pre-existing injury, loss wages, loss profits, and had to expend additional expenses to investigate the source of a potential discharge.

**WHEREFORE**, Plaintiff, **Mr. Dulcio** respectfully request trial by jury against **Count3Defendants** for compensatory damages and punitive damages (*If the court finds it proper*) for a combined total within the jurisdictional

limits of this Court, together with cost of suit, interest, and any further relief as the Court deems proper.

# COUNT IV
## ACTION FOR DAMAGES RESULTING FROM
## *VIOLATION OF CHAPTER 376 Fla. Stat.*
### *vs. (ARCADIS, GROUNDWATER PROTECTION & EARTHTECH)*

124.    Plaintiff reiterates and hereby incorporates the allegations contained in paragraphs 1 through 100 as if stated fully and further alleges as follows:

125.    This action arises from work that was performed at the **LSC-Plant** site between December 3, 2018 through January 11, 2019, and also between September 9, 2020 through September 10, 2020 by **Arcadis, Groundwater Protection**, and **EarthTech** (hereinafter, "**Count4Defendants**").

126.    Chapter 376, Florida Statutes, addresses the serious ground and water pollution problems caused by contamination of groundwater and/or soil.

127.    Chapter 376.30, Florida Statute, states;

> *"That the preservation of surface and ground waters is a matter of the highest urgency and priority, as these waters provide the primary source for potable water in this state".*

128.    The Florida Legislature further recognizes that it is vital to protect Florida's land and water resources from such pollution, and make it a top priority to prevent and quickly remedy any pollution:

> *Spills, discharges, and escapes of pollutants, drycleaning solvents, and hazardous substances that occur as a result of procedures taken by*

> *private and governmental entities involving the storage,*
>
> *transportation, and disposal of such products pose threats of great*
>
> *danger and damage to the environment of the state, to the citizens of*
>
> *the state, and to other interests deriving livelihood from the state.*
>
> *376.30(2)(b), Fla Stat*

129.   § 376.313, Florida Statutes, provides for a private cause of action to recover all damages resulting from a discharge or other condition of pollution covered by Sections 376.30 – 376.317, Florida Statutes.

130.   Pursuant to Section 376.301, Florida Statute, "discharge" includes;

> *"spilling, leaking, seeping, pouring, misapplying, emitting, emptying,*
>
> *releasing, or dumping" any pollutant or hazardous substance which*
>
> *occurs and which affects lands and surface or ground waters."*

131.   376.313(1) Fla. Stat. states;

> *The remedies in ss. 376.30-376.317 shall be deemed to be*
>
> *cumulative and not exclusive.*

132.   Investigation of the **LSC-Plant** site has revealed that the site was and still is a **DNAPL** site, and due to **Count4Defendants** negligence with the handling of the site, a previous discharge that was trapped in the vadose zone, was transported to the ground water through a process that the **EPA** refers to as "Short Circuiting".

133.    Due to the short circuiting, caused by the wells developed by **Count4Defendants** an old discharge of **PERC**, that was immobile, was able to migrate and create a new discharge or other condition of pollution covered by Sections 376.30 through 376.317, Fla Stat.

134.    As a direct cause of the discharge or other conditions of pollution set forth above, the groundwater below the **LSC-Plant** site became highly contaminated with pollutants.

135.    As a direct and proximate cause of the defendants actions **Mr. Dulcio** suffered damages in the form of; damage to a pre-existing injury, loss wages, loss profits, and had to expend additional finances to investigate the source of a potential discharge.

WHEREFORE, Plaintiff, **Mr. Dulcio** respectfully demands trial by jury against **Count4Defendants** for compensatory damages and punitive damages *(If the court finds it proper)* for a combined total within the jurisdictional limits of this Court, together with cost of suit, interest, and any further relief as the Court deems proper.

# COUNT V
# DEPRIVATION OF RIGHTS
# UNDER THE COLOR OF LAW
## 42 U.S.C. § 1983 (First Amendment)
### *vs. (INSPECTOR1 & FORMERAGENT1)*

136.    Plaintiff reiterates and hereby incorporates the allegations contained in paragraphs 1 through 100 as if stated fully and further alleges as follows:

137.    This action arises from 2 separate encounters that **Mr. Dulcio** experienced with the **FDEP** on April 16, 2021, and on September 1, 2021 from **Inspector1**, and **FormerAgent1** (hereinafter, "**Count5Defendants**").

138.    On April 16, 2021, **Inspector1** arrived to the **LSC-Plant** site to perform an inspection of the site. **Mr. Dulcio** intended to be present but was not able to due to a family emergency. Due to **Mr. Dulcio**'s absence **Mr. Dulcio** requested that his employee that was onsite Monach (hereinafter "**Employee1**") to openly video record the **FDEP** official for the purposes of documenting the visit and also documenting any violations, area of concern, and general recommendations/comments that **Inspector1** may make.

139.    One minute after **Employee1** began openly recording **Inspector1**, **Inspector1** demanded that he stop recording her, **Employee1** explained that he was only recording **Inspector1** by request of **Mr. Dulcio**.

140.    **Inspector1** advised **Employee1** that if he continues to record her, that he (**Employee1**) and **Mr. Dulcio** will be guilty of obstructing/hindering the inspection. *(please see "Reference I")*

141.    On September 1, 2021 **Mr. Dulcio** was on a conference call with **PropertyOwner1**, and **Count5Defendants** to discuss the violations issued on April 16, 2021 inspection, during this call **Inspector1** directly threaten **Mr. Dulcio** with the assistance of **FormerAgent1** that if Mr. Dulcio attempts to record an inspection again, he will be in violation of an agency policy.

*142.*    The First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest *(please see Blackston v. Alabama, 30 F.3d 117, 120 (11th Cir.1994).*

*143.*    **Count5Defendants** deprived **Mr. Dulcio** of his 1st Amendment right, and they also attempted to discourage Mr. Dulcio from exercising that right in the future.

*144.*    As a direct and proximate cause of this deprivation, as described above **Mr. Dulcio** suffered damage to a pre-existing injury, emotional distress, and mental anguish.

   **WHEREFORE**, Plaintiff, **Mr. Dulcio** respectfully demands trial by jury against **Count5Defendants** for compensatory damages and punitive

damages *(If the court finds it proper)* for a combined total within the jurisdictional limits of this Court, together with cost of suit, interest, and any further relief as the Court deems proper.

# COUNT VI
## DEFAMATION(LIBEL)
### *vs. (DIRECTOR1, MANAGER2 & INSPECTOR1)*

**145.**    Plaintiff reiterates and hereby incorporates the allegations contained in paragraphs 1 through 100 as if stated fully and further alleges as follows:

**146.**    The defendants relevant to this count are **Director1**, **Manager2**, and **Inspector1** (hereinafter, "**Count6Defendants**").

**147.**    On July 25, 2019, **Manager2**, and **Inspector1** came to the **LSC-Plant** site to perform an inspection, at the end of the inspection **Manager2**, and **Inspector1** issued **Mr. Dulcio** a series of violations that were known to be false by both parties at the time the violations were issued.

**148.**    **Mr. Dulcio** was able to resolve the violations by performing some recommended tasks, and by reporting **Manager2**, to her superior **Manager1**.

**149.**    On April 16, 2021, Under the direction of **Manager2**, **Inspector1** returned to the **LSC-Plant** site and re-issued the same violations (that were known to be false) from the inspection that was conducted on July 25, 2019, along with 2 additional violations that were meritless, and that Inspector1 knew or should have known were false and meritless at the time that the violations were issued.

150.    On June 8, 2021, **Mr. Dulcio** received the official warning letter from the **FDEP** by way of **Director1** outlining the same meritless violations.

151.    376.302(12) Fla. Stat. states;

>    To knowingly make any false statement, representation, or certification in any application, record, report, plan, or other document filed or required to be maintained under this chapter, or to falsify, tamper with, or knowingly render inaccurate any monitoring device or method required to be maintained under this chapter or by any permit, registration, rule, or order issued under this chapter.

152.    18 U.S.C § 1519 states;

>    Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such

matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

153.   **Mr. Dulcio** believes his race, personal animus (from **Count6Defendants** toward **Mr. Dulcio**), and the desire to classify **Mr. Dulcio** as a Significant Non-Complier (hereinafter, "**SNC**") in the **FDEP/EPA** database were the motivating factors behind these actions.

154.   A **SNC** classification enables the **FDEP** to impose harsher penalties, fines, and a shorter timeline for the violator to return to compliance.

155.   **Mr. Dulcio** resolved all the meritless, and false violations that were issued against him by July 1, 2021, but in furtherance of the conspiracy **Count6Defendants** deliberately left **Mr. Dulcio** in non-compliance status for the purposes of punishing **Mr. Dulcio** and initiating a criminal investigation.

156.   As a direct and proximate cause of this conspiracy **Mr. Dulcio** suffered irreparable harm to his financial, mental, and emotional health.

**WHEREFORE**, Plaintiff, **Mr. Dulcio** respectfully demands trial by jury against **Count6Defendants** for compensatory damages and punitive damages (*If the court finds it proper*) for a combined total within the jurisdictional limits of this Court, together with cost of suit, interest, and any further relief as the Court deems proper.

# COUNT VII
# FRAUDULANT CONCEALMENT
## *vs. (ARCADIS)*

**157.**   Plaintiff reiterates and hereby incorporates the allegations contained in paragraphs 1 through 100 as if stated fully and further alleges as follows:

**158.**   **Arcadis** (hereinafter, "**Count6Defendants**") being the professionally contracted company for engineering, design, and consultation services for the **LSC-Plant** site, had a duty to disclose their current and previous suspensions of free product.

**159.**   376.302(12) Fla. Stat. states;

> To knowingly make any false statement, representation, or certification in any application, record, report, plan, or other document filed or required to be maintained under this chapter, or to falsify, tamper with, or knowingly render inaccurate any monitoring device or method required to be maintained under this chapter or by any permit, registration, rule, or order issued under this chapter.

**160.**   18 U.S.C § 1519 states;

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record,

document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

161.  556.105 Fla. Stat. states;

If any contact with or damage to any pipe, cable or its protective covering, or any other underground facility occurs, the excavator causing the contact or damage shall immediately notify the member operator. If contact with or damage to an underground pipe or any other underground facility results in the escape of any natural gas or other hazardous substance or material regulated by the Pipeline and Hazardous Materials Safety Administration of the United States Department of Transportation, the excavator must immediately report the contact or damage by calling the 911 emergency

telephone number. Upon receiving notice, the member

operator shall send personnel to the location as soon as

possible to effect temporary or permanent repair of the

contact or damage. Until such time as the contact or

damage has been repaired, the excavator shall cease

excavation or demolition activities that may cause further

damage to such underground facility.

162.   Arcadis had a duty to report to the FDEP that Groundwater

protection made contract and/or damaged a pipe line at the LSC-Plant site.

163.   Arcadis breached its duty when they failed to report to the

FDEP that Groundwater Protection made contact with and/or damaged

the septic pipeline at the **LSC-Plant** site.

164.   On several occasions after the September 10, 2020 sampling event,

the **FDEP** asked **Count6Defendants**; if it was possible for the spike in the

Chemical of Concern (hereinafter, "**COC**") concentration in the groundwater and

septic tank could have been the result of a new discharge.

165.   **Count6Defendants** failed to mention their previous suspensions of

free product, or that their subcontractor **Groundwater Protection** has been

negligent in the past in regards to drilling into underground tank supply/vapor

lines, causing cross contamination between the contents in the tank and its surrounding soil.

166. **Count6Defendants** knew, or should have known of the potential presence of free product at the **LSC-Plant** site, per communications that **Count6Defendants** engaged in with FDEP, when **Count6Defendants** requested that excavation be considered prior to well development.

167. **Count6Defendants** knew that **Mr. Dulcio**, and the **FDEP** were relying on **Count6Defendants**'s expert opinion prior to initiating additional site assessments and confirmatory sampling to delineate the source of the new discharge or other condition at the expense of **Mr. Dulcio**.

168. **Count6Defendants** had both a professional as well as a contractual duty to disclose to the FDEP and by extension to the Mr. Dulcio, the mistakes that were made, and what the best course of action should be.

169. As a direct and proximate result of **Count6Defendants** Fraudulent Concealment as described above, Mr. Dulcio sustained damages to a pre-existing injury, loss of wages, loss of income, loss of the enjoyment of life, damage to his personal reputation, damage to his business relationships.

WHEREFORE, Plaintiff, Mr. Dulcio respectfully demands trial by jury against **Count6Defendants** for compensatory damages and punitive damages (*If the court finds it proper*) for a combined total within the jurisdictional

limits of this Court, together with cost of suit, interest, and any further relief as

the Court deems proper.

# <u>COUNT VIII</u>
## CONSPIRACY TO INTERFERE
## <u>WITH CIVIL RIGHTS</u>
### *42 U.S.C. § 1985(c) (Thirteenth Amendment)*
#### *vs. (DIRECTOR2, MANAGER2, INSPECTOR1, FORMERAGENT1 & COUNSEL1)*

**170.**    Plaintiff reiterates and hereby incorporates the allegations contained in paragraphs 1 through 100 as if stated fully and further alleges as follows:

**171.**    Defendants: **Director2, Manager2, Inspector1, FormerAgent1, Counsel1**(In-Concert) (hereinafter, **"Count8Defendants"**) conspired together to subject **Mr. Dulcio** to involuntary servitude/slavery.

**172.**    18 U.S.C. 241 states;

> If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same;

**173.**    18 U.S.C. 242 states;

> Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the

deprivation of any rights, privileges, or immunities secured or

protected by the Constitution or laws of the United States, or

to different punishments, pains, or penalties, on account of

such person being an alien, or by reason of his color, or race,

than are prescribed for the punishment of citizens, shall be

fined under this title or imprisoned not more than one year, or

both;....

174.    By way of extortion/blackmail, and coercion, **Count8Defendants**

conspired to compel **Mr. Dulcio** (Due to his race) to perform a series of task that

he (**Mr. Dulcio**) was not legally obligated nor responsible to perform.

175.    The main task **Count8Defendants** conspired to have **Mr. Dulcio** to

perform was a site assessment (hereinafter, "**Confirmatory Sampling**"), that **Mr.**

**Dulcio** declined to perform, due to Florida Statutes Chapter 376.3078; (1c), (1d),

(2b), (2b1), (2b2), (2b3), making the entire investigation portion of the site

assessment/re-assessment a discretionary action for **Mr. Dulcio**, and a non-

discretionary action for the **FDEP** to perform.

176.    Florida Statutes Chapter 376.3078(13b) gives the **FDEP** the authority

to diligently pursue **reimbursement** of all costs incurred, including the cost of

investigation (site assessment/re-assessment) after the fact, not before the fact.

177.   On April 16, 2021, the **FDEP** issued **Mr. Dulcio** 3 violations that were meritless and false.

*178.*   On May 22, 2021, *(as mentioned in the factual allegations section)* Truist bank informed **HRI** that it will not be able to utilize the property as collateral due to the **LSC-Pant** site being in a non-compliance status.

*179.*   This information made **PropertyOwner1** very upset with **Mr. Dulcio, PropertyOwner1** demanded that **Mr. Dulcio** resolve these violations immediately.

180.   prior to July 1, 2021, **Mr. Dulcio** resolved the violations and pleaded with the **FDEP** to place **LSC-Plant** site back into compliance, the **FDEP** declined, stating that; They (**FDEP**) believe there exist another violation (separate of what was in the FDEP warning letter).

181.   Due to the perpetual state of non-compliance that the **FDEP** imposed on **Mr. Dulcio, Mr. Dulcio**'s personal, and business relationship with **PropertyOwner1** became very damaged and estranged.

182.   July 18, 2021, **PropertyOwner1** demanded that Mr. Dulcio return the keys for the **LSC-Plant** site, due to a clause within the lease agreement that required **Mr. Dulcio** to be in compliance with all federal, state, and local laws. **Mr. Dulcio** begged **PropertyOwner1** to allow him to sell the business instead, due to **Mr. Dulcio** expecting the birth of his last child in August.

183.   **PropertyOwner1** agreed and advised **Mr. Dulcio**, that he had until November 1, 2021, to sell the business.

184.   **Mr. Dulcio** Marketed the business and found several prospective buyers.

185.   **Mr. Dulcio** informed the **FDEP** of his desire to sell the business, and that he (**Mr. Dulcio**) understood that selling the business would not transfer the responsibility of resolving any previous violation.

186.   On September 1, 2021 (Through a Conference Call), **FormerAgent1**, and **Inspector1** propositioned **Mr. Dulcio** that if he performed the **Confirmatory Sampling** that the **FDEP** would place him back into compliance status, **Mr. Dulcio** declined stating that; it was not **Mr. Dulcio**'s responsibility to perform the **Confirmatory Sampling**.

187.   On September 8, 2021 (through email), **Inspector1** re-requested that I (**Mr. Dulcio**) perform the **confirmatory sampling**

188.   On October 11, 2021 (through email), **Manager2** requested that I (**Mr. Dulcio**) perform the **confirmatory sampling** if not than my eligibility in the DSCP would be in jeopardy.

189.   On October 12, 2021 (through email), **Mr. Dulcio** informed the **FDEP** through **Manager2** that he (**Mr. Dulcio**) could not afford to perform the **confirmatory Sampling**.

190.    On October 19, 2021 (through email), **Manager2** advised **Mr. Dulcio** that he was legally obligated to perform the **Confirmatory Sampling**, and sited two Florida Administrative Code Rules (62-730.225, 62-780.600), neither of the administrative codes supported **Manager2's** assertions, within the same aforementioned email **Manager2** threated **Mr. Dulcio** by stating that if **Mr. Dulcio** does not perform the **Confirmatory Sampling** that the **FDEP** will move forward with their Office of General Counsel procedures.

191.    On October 20, 2021 (through email), **Manager2** advised **Mr. Dulcio** that if he was not going to perform the **Confirmatory Sampling**, that the FDEP will issue a formal Notice of Violation.

192.    On October 25, 2021 (through email), **Director2** made the same request for **Mr. Dulcio** to perform the **Confirmatory Sampling**.

193.    On June 27, 2022 (through email), **Counsel1** made the same request to **Mr. Dulcio** to perform the **confirmatory sampling**.

194.    When I (**Mr. Dulcio**) requested for the law, statute, or ordinance that requires this of me, I received silence.

195.    As a direct and proximate cause of this conspiracy, I (**Mr. Dulcio**) suffered mental & emotional anguish, financial hardships, damage to a pre-existing injury, damage to reputation, loss of business, loss of business

relationships, loss of profits, loss of income, loss of enjoyment of life, and a diminished sense of self value & worth.

WHEREFORE, Plaintiff, **Mr. Dulcio** respectfully demands trial by jury against **Count8Defendants** for compensatory damages and punitive damages *(If the court finds it proper)* for a combined total within the jurisdictional limits of this Court, together with cost of suit, interest, and any further relief as the Court deems proper.

# COUNT VIV
## ACTION FOR
## NEGLECT TO PREVENT
### *42 U.S.C. § 1986 vs.*
*(EPA-ADMINISTRATOR1, MANAGER1, SECRETARY1, COUNSEL2)*
*(PROGRAMDIRECTOR1, CONTRACTMANAGER1)*
*(FDEP-SECRETARY, EPA-AGENT1 & EPA-AGENT2)*

196.   Plaintiff reiterates and hereby incorporates the allegations contained in paragraphs 1 through 100 as if stated fully and further alleges as follows:

197.   The defendants relevant to this count are **EPA-Administrator1**, **Secretary1**, **Counsel2**, **ProgramDirector1**, **ContractorManager1**, **FDEP-Secretary**, **EPA-Agent1**, and **EPA-Agent2** (hereinafter, **"Count9Defendants"**).

198.   This is an action brought under 42 U.S.C. § 1986, which allows for damage recover from those who were aware of the conspiracy to interfere with civil rights (42 U.S.C. § 1985 Count XIII).

199.   On June 28, 2022, **Mr. Dulcio** composed an email (hereinafter, **"EmailChain"**) to several individuals of the **FDEP** (**ProgramDirector1**, **ContractManaer1**, **Manager1**, **FDEP-Secretary**)within this email **Mr. Dulcio** communicated his frustrations with the way he has been treated by the **FDEP** and for the purposes of transparency, and continuity **Mr. Dulcio** included 2 additional participants (**Secretary1**, and **Counsel2**), in hopes that these individuals would intervene and assist in ending the undeserved punishment

that **Mr. Dulcio** was being subjected to, but unfortunately for Mr. Dulcio these individuals would do nothing toward ending **Mr. Dulcio** agony.

200.    On July 5, 2022, **Mr. Dulcio** replied to the **EmailChain** with an email that outlined in much detail all the technical errors that the **FDEP** had within their understanding of hazardous waste and the mistakes that were made in site characterization for the **LSC-Plant** site. In hopes of finally bringing this matter to a close.

201.    Due to the complicated nature of **Mr. Dulcio** email and for the purposes of concurrences from the **EPA** (the author, and publisher of the information **Mr. Dulcio** utilized to correct the **FDEP**) **Mr. Dulcio** included two additional participants (**EPA-AGENT1**, **EPA-AGENT2**), unfortunately for **Mr. Dulcio** these 2 individuals decided not to render aid or assist in the prevention of the conspiracy to interfere with **Mr. Dulcio**'s civil rights.

202.    On Oct 1, 2022, **Mr. Dulcio** replied to the **EmailChain** which encompassed all defendants, venting his frustration and disappointment with the **EPA**, and **FDEP** and their lack of care for the environment, and above all **Mr. Dulcio**, and pleaded for some assistance in understanding why the departure from standard protocol, at the end of **Mr. Dulcio**'s email response he (**Mr. Dulcio**) included as a new participant **EPA-Administrator1**.

203.    As a direct and proximate cause of this deprivation of rights **Mr. Dulcio** suffered financial, mental, and emotional hardships.

**WHEREFORE**, Plaintiff, **Mr. Dulcio** respectfully demands trial by jury against **Count9Defendants** for compensatory damages and punitive damages *(If the court finds it proper)* for a combined total within the jurisdictional limits of this Court, together with cost of suit, interest, and any further relief as the Court deems proper.

# <u>COUNT X</u>
# DEPRIVATION OF RIGHTS
# <u>UNDER THE COLOR OF LAW</u>
### *42 U.S.C § 1983 (Eighth Amendment)*
### *vs. (DIRECTOR1, MANAGER2, INSPECTOR1 & COUNSEL1)*

204.    Plaintiff reiterates and hereby incorporates the allegations contained in paragraphs 1 through 100 as if stated fully and further alleges as follows:

205.    The defendants relevant to this count are: **Director1**, **Manager2**, **Inspector1**, and **Counsel1** (hereinafter, "**Count10Defendants**")

206.    The Eighth amendment to the United States Constitution states;

> Excessive bail shall not be required, nor excessive fines imposed, **nor cruel and unusual punishments inflicted**.

207.    **Mr. Dulcio** was subjected to cruel and unusual punishment when the defendants;

    a.    Deliberately violated Mr. Dulcio for concerns that were not violations. *(Inspector1)*

    b.    Deliberately kept **Mr. Dulcio** in non-compliance status for the purposes of classifying/re-classifying him (**Mr. Dulcio**) as a significant non-complier. *(Manager2)*

c.  Initiated a criminal investigation into **Mr. Dulcio** without first performing a proper investigation (in direct conflict with the FDEP Enforcement Manual). *(Director1)*

d.  Initiated an Administrative procedure against **Mr. Dulcio** despite **Mr. Dulcio** having liability protection as a result of being in the Drycleaner Solvent CleanUp Program. *(Director1 & Counsel1)*

**WHEREFORE**, Plaintiff, **Mr. Dulcio** respectfully demands trial by jury against **Count10Defendants** for compensatory damages and punitive damages *(If the court finds it proper)* for a combined total within the jurisdictional limits of this Court, together with cost of suit, interest, and any further relief as the Court deems proper.

# COUNT XI
## DEPRIVATION OF RIGHTS
## UNDER THE COLOR OF LAW
### 42 U.S.C. § 1983 (Fla. Stat. 376.3078(3)(a))
#### vs. (DIRECTOR1, DIRECTOR2, MANAGER2, INSPECTOR1 & COUNSEL1)

208.    Plaintiff reiterates and hereby incorporates the allegations contained in paragraphs 1 through 100 as if stated fully and further alleges as follows:

209.    Florida Statutes Chapter 376.3078(3)(a) states;

> In accordance with the eligibility provisions of this section, a real property owner, nearby real property owner, or **person who owns or operates,** or who otherwise could be liable as a result of the operation of, a drycleaning facility or a wholesale supply facility **is not liable for or subject to administrative or judicial action** brought by or on behalf of any state or local government or agency thereof or by or on behalf of any person to compel rehabilitation or pay for the costs of rehabilitation of environmental contamination resulting from the discharge of drycleaning solvents.

210.    On February 10, 2022, **Director1, Director2, Manager2, Inspector1,** and in-concert **Counsel1** (hereinafter, **"Count11Defendants"**) subjected **Mr. Dulcio** to an unlawful administrative proceeding by way of the issuance of a

"Notice of Violation, Orders for Corrective Action and Administrative Penalty Assessment" served on **Mr. Dulcio** (*via* Certified Mail Number: 91 7199 9991 7030 9095 8663), where **Mr. Dulcio** was assessed an administrative penalty in the amount of $81,460.00.

211.   As a direct and proximate cause of this deprivation of rights **Mr. Dulcio** suffered financial, mental, and emotional hardships.

**WHEREFORE,** Plaintiff, Mr. Dulcio respectfully demands trial by jury against **Count11Defendants** for compensatory damages and punitive damages *(If the court finds it proper)* for a combined total within the jurisdictional limits of this Court, together with cost of suit, interest, and any further relief as the Court deems proper.

# COUNT XII
## ACTION FOR CORRECTIVE ACTION, AND ADMINISTRATIVE PENALTY ASSESSMENT
### 33 U.S.C. § 1321(g)
#### vs. (EPA & FDEP)

212.    Plaintiff reiterates and hereby incorporates the allegations contained in paragraphs 1 through 100 as if stated fully and further alleges as follows:

213.    The defendants relevant to this count are: **EPA**, and **FDEP** (hereinafter, "**Count12Defendants**")

214.    **FDEP** is *respondeat superior* for **Arcadis**.

215.    **Mr. Dulcio** is authorized to bring this action by-way of 33 U.S.C. § 1365(a).

216. 33 U.S.C. § 1321 definitions pertinent to **Count XII**;

   a.  (a)(2) "***Discharge***" includes, but is not limited to, any spilling, leaking, pumping, pouring, emitting, emptying or dumping.

   b.  (a)(7) "***Person***" includes an individual, firm, corporation, association, and a partnership.

   c.  (a)(10) "***Onshore Facility***" means any facility (including, but not limited to, motor vehicles and rolling stock) of any kind located in, on, or under, any land within the United States other than submerged land.

   d.  (a)(14) "***Hazardous Substance***" means elements and compounds which, when discharged in any quantity into or upon the navigable "**Waters of the United States**" or adjoining shorelines

or the waters of the contiguous zone or in connection with
activities under the Outer Continental Shelf Lands Act [43 U.S.C.
1331 et seq.] or the Deepwater Port Act of 1974 [33 U.S.C. 1501 et
seq.], or which may affect natural resources belonging to,
appertaining to, or under the exclusive management authority of
the United States (including resources under the Magnuson-
Stevens Fishery Conservation and Management Act [16 U.S.C.
1801 et seq.]), present an imminent and substantial danger to the
public health or welfare, including, but not limited to, fish,
shellfish, wildlife, shorelines, and beaches

217.    Per the **EPA**'s website groundwater is often hydrologically
connected to navigable waters…

218.    … therefore, groundwater has the potential to migrate and
contaminate navigable waters.

219.    **Mr. Dulcio** has complied with all the prerequisites of this citizens
suit in accordance with 33 U.S.C. § 1365(b1)&(b2)

220.    To date the **EPA** nor the **State** nor the **FDEP** has commenced or is
diligently prosecuting a civil and/or criminal action in a court of the United
States, or a state to require compliance with the standard.

221.    The **LSC-Plant** site is a **DNAPL** site, that rest above a sole source
aquifer (Biscayne Aquifer) and as a result of being a **DNAPL** site there was a
level of care and caution that should have been exercised in the remediation of
the site that was not utilized and/or satisfied by both **Arcadis** and the FDEP.

222.    Between December 3, 2018 through January 11, 2019 **Arcadis**
constructed 5 wells at the **LSC-Plant** site.

223.    On September 9, 2020, **Arcadis** returned and constructed 2 additional wells, for a total of 7 wells.

224.    All wells due to where and how they were developed/constructed constitutes 7 violations of 33 U.S.C. § 1321 paragraph (3).

225.    Due to the catastrophic harm to the environment these violations warrant the assessment of a class II penalty under subparagraph(A) which may not exceed $10,000 per day per violation, but due to the gross negligence involved the $125,000 cap should not apply.

226.    The number of days from the development/construction of the first 5 wells (January 11, 2019) until today equal 1,422 days, when multiplied by the number of wells (1,422 x 5) equal 7,110, when multiplied by the $10,000 per day civil penalty under subsection (a) equal $71,100,000.

227.    The number of days from the development/construction of the last 2 wells (September 10, 2020) until today equal 814 days, when multiplied by the number of wells (814 x 2) equal 1,628, when multiplied by the $10,000 per day civil penalty under subsection (a) equal $16,280,000.

228.    The combined assessed total for civil penalty ($71,100,000 + $16,280,000) equals ($87,380,000).

229.    As a direct and proximate cause of the gross negligence of **Arcadis**, and the **FDEP** a condition that is the equivalent of a discharge/new discharge was achieved.

230.    Causing the navigable waters of the United States to become highly contaminated with copious amounts of hazardous waste/substances.

231.    33 U.S.C. § 1321(g) states; "[I]n any other case the liability of such third party shall not exceed the limitation which would have been applicable to the owner or operator of the vessel or the **onshore** or offshore facility from which the discharge actually occurred if such owner or operator were liable."

232.    33 U.S.C. § 1321(f)(2)(c); for the removal of such oil or **substance** by the **United States Government** in an amount not to exceed $50,000,000, **except that where the United States can show that such discharge was the result of <u>willful negligence</u> or <u>willful misconduct</u>** within the privity and knowledge of the owner, such owner or operator shall be liable to the **United States Government** for the full amount of such costs. The **United States** may bring an action against the owner or operator of such facility in any court of competent jurisdiction to recover such costs.

233.    As a direct and proximate cause of **Count12Defendants** actions Mr. Dulcio suffered all of the damages as outlined in the "**Damages/Losses Suffered**" section of this complaint.

**WHEREFORE**, Plaintiff, **Mr. Dulcio** respectfully demands trial by jury against **Count12Defendants** for nominal damages *(If the court finds it proper)*, injunctive relief against the FDEP for the immediate remediation of the **LSC-Plant** site, injunctive relief against the EPA to assess an administrative penalty against the **FDEP**, plus expert witness fees for a combined total within the jurisdictional limits of this Court, together with cost of suit, and any further relief as the Court deems proper.

# **SUMMARY OF**
# **DAMAGES/LOSSES SUFFERED**

234.   As a direct and proximate result of the act(s) and/or omission(s) and/or indifference(s) of ALL Defendants Mr. Dulcio suffered;

**a.**   Lost of his government contracts, which required him to be in compliance with ALL federal, and state laws.

**b.**   Lost of the ability to bid on any additional government contract, until the violations were resolved.

**c.**   Lost of his exclusive textile restoration contract with a reputable water restoration company, that services all of Florida.

**d.**   Lost of the LSC-Plant, which performed all of his dry cleaning, laundry services, and alterations for LSC-DropOff-1, LSC-DropOff-2.

**e.**   Lost of LSC-DropOff-1

**f.**   Lost of LSC-DropOff-2

**g.**   Damage to Business relationships

**h.**   Damage to Business Reputation.

**i.**   Mental Anguish

**j.**   Embarrassment

**k.**   Loss of quality of life

**l.**  Loss of enjoyment of life

**m.** Loss of Opportunities

**n.**  Dissociation

**o.**  Exhaustion

**p.**  Lack of Motivation

**q.**  Anxiety

**r.**  Confusion

**s.**  Depression

**t.**  A diminished sense of self value/worth

**u.**  Lost of trust in the government

**v.**  Feelings of Hopelessness/Helplessness

**w.** An inability to provide for himself and his family

## DEMAND FOR JURY TRIAL

PLAINTIFF, **MR. DULCIO** HEREBY RESPECTFULLY DEMANDS

TRIAL BY JURY IN THE ABOVE-STYLE ACTION.

Dated this 5th day of December, 2022

By: _Marc Dulcio_

Marc M. Dulcio • Pro Se Litigant

**Marc M. Dulcio**
70 N.E. 131st Street
North Miami, FL 33161
Cellphone: (561) 660-4855
Secondary Email Address:
MarcDulcio@Hotmail.com