# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

## CASE NO. 9:22-CV-81908-RLR

**MARC M. DULCIO,**

      Plaintiff,

v.

**ENVIRONMENTAL PROTECTION
AGENCY,** *et al.,*

      Defendants.

_____/

FILED BY _Mtt_ D.C.

JUN 0 1 2023

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

## TABLE OF CONTENTS

*Second Amended Complaint* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*Introduction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*Jurisdiction & Venue* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2-3*

*Parties* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *3-4*

*General Factual Allegations* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *5-21*

*COUNT I v. ARCADIS*
*STRICT LIABILITY (First Drilling Event)* . . . . . . . . . . . . . . . . . . . . . . . . . . . .*22-24*

*COUNT II v. GWP*
*STRICT LIABILITY (First Drilling Event)* . . . . . . . . . . . . . . . . . . . . . . . . . . . .*25-27*

*COUNT III v. ARCADIS*
*STRICT LIABILITY (Second Drilling Event)* . . . . . . . . . . . . . . . . . . . . . . . . . .*28-30*

*COUNT IV v. EARTHTECH*
*STRICT LIABILITY (Second Drilling Event)* . . . . . . . . . . . . . . . . . . . . . . . . . .*31-33*

*COUNT V v. ARCADIS, JASON, ALANNAH & ROMINA*
*CONSPIRACY TO INTERFERE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *34-37*

*COUNT VI v. STACI*
*ACTION FOR NEGLECT TO PREVENT* . . . . . . . . . . . . . . . . . . . . . . . . . . . . *37-38*

*PRAYER FOR RELIEF* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *39*

1

### *SECOND AMENDED COMPLAINT*

**COMES NOW** Marc M. Dulcio (hereinafter, "Plaintiff") in accordance with the limited leave to amend sues Defendants; JASON ANDREOTTA, STACI KICHLER, ALANNAH IRWIN, ROMINA LANCELLOTTI, ARCADIS U.S., INC., GPI PROPERTIES, INC., and EARTH TECH DRILLING, INC., as the result of violations of Federal, State, and Local Laws.

### *INTRODUCTION*

Plaintiff, is an African American male who has been professionally diagnosed as having a learning disability (at all times material) was attempting to provide for his family by and through his Dry-Cleaning business(es). From the onset of Plaintiff's business endeavor, he faced disparaging treatment from 2 white (non-black) employees of the FDEP as a result of Plaintiff being an African American male with a heightened distain for those who are not subservient to their perceived authority. Sadly, the abusive treatment Plaintiff endured for merely existing and/or attempting to conduct business while Black is not unusual or surprising, the duration of the abuse is. This civil rights action seeks to vindicate Plaintiff's sense of value, worth, constitutional, and statutory rights and hold the offenders and their respective departments accountable for biased policing practices and the policies (or absence of policies) that resulted in these practices.

### *JURISDICTION AND VENUE*

### *JURISDICTION*

1.      This Court has jurisdiction pursuant to *28 U.S.C. § 1331, 1343, 1391 (b)* as this is a Civil Rights Claim under *42 U.S.C. §§ 1983, 1985, 1986, 1988 (Federal Question(s))*, and *28 U.S.C. § 1367(a)*, which grants this Court supplemental jurisdiction over state law claims related to the federal claims. Lastly the amount in controversy is in excess of $100,000 exclusive of cost, and

interest, coupled with the diversity of citizenship properly vests this Court with jurisdiction, and ALL conditions precedent has occurred or been performed.

## *VENUE*

**2.**     Venue is proper in this judicial district under *28 U.S.C. § 89(c)* as the events that gave rise to this Complaint occurred in this District. Venue is further made proper in the Southern District of Florida as the incident(s)/act(s)/omission(s) occurred and accrued in this district.

## *PARTIES*

**3.**     *Marc M. Dulcio* (hereinafter, "***Plaintiff***"), is a member of multiple protected classes due to plaintiff being an African American Male, and an American with Disability (Learning Disability) and at all times material hereto, was an individual residing in Palm Beach, Florida and is *sui juris*. Plaintiff is the business owner of New LifeStyle Cleaners formerly doing business at 2565 Forest Hill Blvd. West Palm Beach, FL 33406.

**4.**     *JASON ANDREOTTA* (hereinafter, "**Jason**"), is employed with the **FDEP-SED** as a District Director, and at all times material hereto, was "operating under the color of law", and whose duties were to provide guidance and oversight to all program areas in the southeast district.

**5.**     *ALANNAH IRWIN* (hereinafter, "**Alannah**"), is employed with the **FDEP-SED** as an Environmental Manager, and at all times material hereto, was "operating under the color of law", and whose duties were to oversee the district's Permitting and Waste Cleanup programs.

**6.**     *ROMINA LANCELLOTTI* (hereinafter, "**Romina**") is employed with the **FDEP-SED** as an Environmental Specialist II, and at all times material hereto, was "operating under the color of law", and whose duties were to oversee the district's Permitting & Waste Cleanup programs.

7.     *STACI KICHLER* (hereinafter, "**Staci**"), is employed with the **FDEP** as legal Counsel, and at all times material hereto, was "operating under the color of law", and whose duties involve serving the interest of **FDEP**, while upholding the law.

8.     *ARCADIS U.S., INC.* (hereinafter, "**Arcadis**") at all times material hereto, was authorized to do business in the state of Florida *(Active Certificate of Authorization #GB564)* and was doing business in the State of Florida through its office in Highland Ranch, Colorado and registered agent in Boynton Beach, Florida. The nature of Arcadis's business is design, engineering, and consultancy solutions for natural and built assets.

9.     *GPI PROPERTIES, INC., d/b/a Groundwater Protect-ion, a division of DrillPro, LLC.* (hereinafter, "**GWP**"), is a Florida limited liability company properly registered and domiciled in Florida, and conducts business from its principal address in Orlando, Florida, The nature of **Groundwater Protection's** business is to provide specialized environmental drilling services.

10.    *EARTH TECH DRILLING, LLC.* (hereinafter, "**EarthTech**"), is a Florida Corporation properly registered and domiciled in Florida, with an office located in Pompano Beach, Florida, The nature of **EarthTech's** business is to provide professional drilling services.

## *GENERAL FACTUAL ALLEGATIONS*

25.     During the year of 2012, Arcadis was contracted to perform remediation at a Shells gas station. Arcadis subcontracted Earthtech, and GWP to perform drilling (excavation) at the gas station, during said excavation Arcadis, Earthtech, and GWP damaged pipes leading to and/or from the underground gas storage tank. Please see segments from the subsequent court filings below.

18.     Upon information stated by Arcadis's in-house counsel, Arcadis entered into a subcontract with Groundwater Protection to perform the drilling required in the Contract.

19.     On June 10, 2013, a tank inspection of the underground petroleum storage system at the Davie Shell facility revealed water leaking into the system.

20.     On June 11, 2013, soil removal by Great Dane Petroleum Contractors, Inc., undertaken to repair the water leak, revealed a strong odor of hydrocarbon vapor and pollutant discharge from the system.

21.     On June 13, 2013, Great Dane Petroleum Contractors, Inc. discovered a punctured Stage II vapor line that was the source of the pollutant discharge.

22.     As a result of the discharge, existing contamination levels at the Davie Shell facility (that Arcadis was responsible for remediating) were exacerbated.

26.     The same water/moisture leaking/leeching occurred at the LSC-Plant site the key difference being the highly contaminated soil at the LSC-Plant site cause the water/moisture to be highly contaminated subsequently causing the contents in the septic tank to be contaminated as well.

27.    The incident at the gas station occurred in 2012. The lawsuit was filed in (August 2016), and the parties reached a settlement in (June 2018), six months prior to the incident at the LSC-Plant site which occurred in December 2018.

28.    The complaint only lists Arcadis and GWP as defendants, nonetheless page 26 of said complaint reveals EarthTech performed work (Please See Exhibit "A") at the site and is culpable as well.

29.    FDEP was made aware of this negligence by the gas station owner Mr. Chambliss when FDEP attempted to sanction the gas station owner for the spike in contamination in the soil at the Shells gas station site.

30.    Within Arcadis and GWP Affirmative Defense they reference FDEP as being negligent, and said negligence substantially contributed to the damages.

**AFFIRMATIVE DEFENSES**

1.    GPI and ARCADIS affirmatively state that, although they have no liability to Plaintiff, any liability found on their part, and any damages awarded in favor of the Plaintiff, are subject to the comparative fault provisions of Florida Statute §768.81.  GPI and ARCADIS are not liable for more than their proportionate share of any economic and non-economic damages in relation to all other responsible parties and non-parties, after reduction for the Plaintiffs' comparative percentage of fault.

The following parties and non-parties are negligent, and their negligence substantially contributed to the damages of the Plaintiff:

a.    CHAMBLISS, LLLP;

b.    Florida Department of Environmental Protection;

31. <u>Prior to December 2017</u>, FDEP assigned the LSC-Plant site to Arcadis to perform the "Initial Site Assessment" (hereinafter, "ISA"), the Senior Scientist for the task was Douglas J. McGlone, and the Principal Hydrogeologist was William D. Vogelsong (same individuals involved at the Shells gas station incident).

32. It was the primary responsibility of the FDEP to properly recognize that the LSC-Plant site was a DNAPL site.

33. It was the contractual responsibility of Arcadis to properly alert FDEP of the possibility as well as plausibility of the LSC-Plant site being a DNAPL site.

34. The FDEP and Arcadis failed to recognize and classify the LSC-Plant site as a DNAPL site and as a direct, proximate, and foreseeable result of this negligence the LSC-Plant site was completely misdiagnosed, mishandled, and subsequently mismanaged.

35. <u>From December 3, 2018 to January 11, 2019</u>, Arcadis along with the services rendered by GWP performed the site assessment at the LSC-Plant site (Please See Exhibit "B").

36. Prior to drilling Arcadis and GWP failed to perform a proper underground survey. As a direct result of this violation of Florida Stat. Chapter 556 pipes leading to and from the septic tanks of the LSC-Plant site were punctured.

37. <u>On June 6th, 2019</u>, Plaintiff was able to purchase/acquire the Life Style Cleaners (hereinafter, "LSC") business and equipment from the property owner for zero dollars and secured 9 months of free rent, and sign a lease agreement to lease the LSC-Plant site for 5 years.

38. The LSC-Plant is registered with the EPA with an EPA ID number of FLD981029168, and with the FDEP with a site ID of ERIC_5194.

39. <u>On or about July 25th 2019</u>, Employees of the FDEP performed a Compliance Evaluation Inspection at the LSC-Plant site. During this inspection Alannah did not issue Plaintiff any

7

violations. Plaintiff was only given 1 recommendation and was told to be sure to register and/or update the owners information, and business name for the said registration a minimum of 30 days prior to the start of business.

40.    During the inspection performed on July 25, 2019, Alannah made a materially false statement in reference to Perchloroethylene (PERC). Plaintiff alerted Alannah to her mistake, due to Alannah's reliance on the false statement when recommending that Plaintiff dispose of the chemical PERC (not the waste by-product) due to it being expired[1]

41.    Alannah became irate, and then proceeded to double down on her assertions, and Plaintiff respectfully disagreed, Alannah become increasingly agitated with Plaintiff.

42.    Prior to this moment Plaintiff, Alannah, and Romina interacted very well with zero issues (Per Plaintiff's observation) After this moment Alannah would become increasingly irate toward Plaintiff with little, to zero patience toward  Plaintiff's questions.

43.    At the end of the inspection Alannah issued Plaintiff zero violations, verbally provided 1 recommendation, and advised Plaintiff of a series of registrations that must be completed at least 30 days prior to the start of business (Business was expected to commence in November 2019).

The business owner was advised that the following registrations will need to be obtained and/or modified at least thirty (30) days prior to commencing operations:
- The AGP registration with the Department's Air Resources Management Program will need to be modified to reflect new ownership and the change in name. This registration will be obtained from the Florida Department of Health in Palm Beach County's Air Pollution and Licensing Program
- The Tanks registration with the Department will need to be modified to reflect the new ownership and name change

44.    After the inspection Plaintiff called the FDEP to confirm if the false information he received from Alannah was correct. Plaintiff spoke with Alannah's supervisor, Norva.

---

[1] Perchloroethylene (According to the EPA) is a forever chemical with an indefinite shelve life, hence why it is extremely dangerous if it is released into the environment.

45.     Plaintiff repeated to Norva the false statement made by Alannah, and Norva agreed with

Plaintiff that PERC does not expire and contended that Plaintiff may have misunderstood and/or

misheard Alannah. Plaintiff reassured Norva that he did not misunderstand or mishear Alannah

due to him having the conversation on a recording.

46.     Plaintiff then requested to file a complaint against Alannah; Norva assured Plaintiff that

would not be necessary, and she will attend to Alannah. Plaintiff said, "Thank you" and then ended

the call.

47.     On September 19th, 2019, Plaintiff received a warning letter from FDEP stating Plaintiff

has failed to rectify violations that were verbally brought to his attention during the inspection.

A compliance evaluation inspection was conducted at the above referenced facility on July 25, 2019
where possible violations of Chapter 376, Florida Statutes, Section 3078(9)(a) may have occurred.
During the inspection, the following potential violation was observed:

- Failure to provide secondary containment for the chemicals on the shelving units adjacent to the
  perchloroethylene storage area, pursuant to sub-section 376.3078(9)(a) F.S.

At the time of the inspection, Department personnel verbally notified the facility that potential violations
existed, and the facility was encouraged to take corrective action within 14 days.

To date, the facility has failed to correct the violation. Therefore, the Department requests you review the
items of concern noted and respond in writing within 10 days of this warning letter. Your written
response should include the following:

(Please See Exhibit "C" for the full letter)

48.     According to the FDEP Enforcement Manual Chapter 4 page 22 "Notice of a possible

violation is never enough to establish that a violation has occurred" and an agent must be able to

prove every element before a violation can be issued. (See Below)

Notice of a possible violation is never enough to establish that a violation has occurred, however. In deciding whether a violation has occurred, the Department must be sure that it has

03/20/13                                    22

sufficient evidence to prove every element of the violation, which are contained in the applicable statutes and rules. For example, Section 403.161, Florida Statutes, provides that it is a violation to fail to comply with a permit. To prove a permit violation requires that the Department prove

49.     The warning letter inappropriately and inaccurately references 376.3078(9)(a) Fla. Stat. to justify the possible violation. At no point during the inspection did Alannah verbally communicate to Plaintiff that this was a violation, Plaintiff out of an abundance of caution video recorded the inspection; therefore, can speak with great certainty that no such verbal communication took place.

50.     Among other issues, the warning letter references the observation of "possible violations", which "may have occurred" and if the "potential violations" are not corrected, Plaintiff would then be violated, for failing to rectify "possible" and/or "potential" violations.

51.     This letter was the beginning of Alannah's attempts of retaliation against Plaintiff for embarrassing her in front of her superiors and attempting to file a complaint against her.

52.     Plaintiff anticipated and therefore recognized the retaliation efforts of Alannah and contacted Norva again for assistance. Norva advised Plaintiff via a phone call to not worry about the violation (she'll attend to them), and if Plaintiff wanted to return to compliance status; to perform a thorough maintenance of the Dry Cleaning Machine (a process Plaintiff already scheduled to be performed later that week) Plaintiff agreed, said "Thank you" and ended the call.

53.     Within the video recording recorded by Plaintiff on July 25th, 2019, is a conversation between Plaintiff, Alannah, Romina, and John Bryant; One of the many topics spoken of during the recording was the possibility of future inspections, Plaintiff asked will the FDEP always schedule an inspection or will it be spontaneous. John Bryant and Alannah immediately responded with "The FDEP will always call and schedule an Inspection".

54.     On the days leading to September 9th, and September 10th of 2020, Plaintiff was present at the LSC-Plant site and can state with absolute certainty neither FDEP, nor Arcadis nor Earthtech performed an underground survey (pursuant to Fla Stat. Section 556) prior to the excavation performed at the LSC-Plant site on September 9th, 10th of 2020.

55.     Between September 9th, 2020, and September 10th, 2020, Arcadis', and their respective sub-contractor EarthTech by and through their employee Edward Marks began drilling at the LSC-Plant site without performing a proper underground survey, and in doing so punctured and/or further damaged the pipes located at the LSC-Plant site causing additional soil contamination to leech into the septic tank, and creating an additional pathway for contamination to enter into the groundwater.

56.     On or about March 25th, 2021, DSCP contacted FDEP-SED and requested that an inspection be performed for the purpose of verifying the status of the facility.

> stated that he turns on the drycleaning machine periodically to keep the seals lubricated. This information should be documented in this report. We also need to discuss this information with the District and likely request a new inspection to verify the current status of the facility. We should verify the proper disposition of the wastes that the District observed in the machine on 7/25/2019. If there was a new release, it may have occurred during rather extensive maintenance on the idle DC machine or since the repairs.

57.     This request created a new opportunity for Alannah to harm Plaintiff, but due to Alannah's new position as an Environmental Manager (previous position "Environmental Specialist III") she was no longer in the field and needed to enlist the assistance of Romina, and in doing so upgraded

her initial aspirations of retaliation into a civil conspiracy against Plaintiff for exercising his First Amendment right of free speech, and using said free speech to redress his government of his grievances.

58.     One week prior to April 13th, 2021, Plaintiff recalls seeing a FDEP vehicle in the parking lot of the LSC-Plant site on 2 separate occasions, but the vehicle's occupant never exited the vehicle.

59.     On April 13th, 2021, Plaintiff was absent from the LSC-Plant site due to business he was attempting to conduct in Miami. While Plaintiff was in Miami the FDEP vehicle returned to the LSC-Plant site, and its occupant (Romina) exited the vehicle, and attempted to perform an inspection.

60.     Romina entered the front door of the LSC-Plant and demanded to perform an inspection. The onsite manager at the time of Romina's arrival was not aware of an inspection, nor did he know who Romina was ("Romina" did not present credentials to onsite manager). The onsite manager called Plaintiff to alert him of Romina, Plaintiff was apprehensive due to FDEP advising him that they would always schedule an inspection, and not just "Pop-Up".

61.     Plaintiff asked Romina if the Inspection could be rescheduled for another date and time but was advised "No" and if Romina is not granted immediate access Plaintiff will be guilty of hindering an investigation and will be violated for a series of other offenses (in direct violation of FDEP policy and procedure.

In no case should the investigator attempt to force entry onto a site, even if the Department has a license or easement.  When entry has been denied or revoked, the investigator should not request the presence of an officer of the law to obtain consent, unless it is necessary to deal with an immediate and serious danger to public health, safety, or the environment.  An investigator must scrupulously avoid conveying any direct or indirect threat of sanctions or punishment to a person who refuses or revokes permission to enter.

**4.3.2.2**  **Site Access Permission by Owner, Operator, or Person in Charge - Implied Permission**

62.     Plaintiff then asked Romina if the inspection could take place later in the afternoon (of the same day), in order to enable Plaintiff time to commute to the LSC-Plant site from Miami.

63.     Romina said "No" and that if Plaintiff does not comply PropertyOwner1 will be in violation of the site access agreement that he signed. Plaintiff made one final request to Romina; "May I please have 5 minutes to contact the property owner?", Romina replied "Yes". Plaintiff made several calls to PropertyOwner1 and was not successful.

64.     Plaintiff respectfully advised Romina that he could not grant her access at that moment. Romina became very irate and began to berate Plaintiff in front of his employees by referring to him as "Mr. Sucio" (The term "Sucio[2]" has historically been used as a derogative racial-slur within the Spanish speaking community) it became evident to Plaintiff that Alannah, and Romina were working in-concert to cause him harm, and they possessed racial animus towards him.

---

[2] When in reference to a person

Additionally, he requested me to reschedule the inspection because he was doing some work in Miami and he desires to be present. I explain that the Hazardous waste program conducts unannounced inspections and we do not reschedule.

Additionally, I explained Mr. Dulcio if I did not gain access to conduct the walkthrough, they would be effectively denying me access in accordance to 403.091 F.S., and we would have to come with an administrative warrant. Mr. Dulcio got upset and told me that I was disrespecting him for not saying his name right, even if I speak Spanish. I apologized and told him that it was not my intention to be disrespectful with him by pronouncing his last name wrong. I added that I was just explaining what

65.     Plaintiff demanded that Romina cease speaking to him in that manor, and to refrain from calling him "Mr. Sucio". Romina complied, Plaintiff informed Romina that he will make an additional attempt to contact PropertyOwner1, and ended the call.

66.     While attempting to contact PropertyOwner1 for a second time, Plaintiff received a text message from LSC-Plant onsite manager stating;

> "Hey the inspection lady will come in the afternoon and you can meet her then around 330" (Please See Exhibit "D")

67.     Plaintiff replied back "Ok" and proceeded to cancel his afternoon appointments in order to be present at the LSC-Plant site for the inspection. While commuting Plaintiff compiled an email to the FDEP to confirm if the person was indeed an FDEP employee, and if so; to file a complaint against the individual for being rude and disorderly.

68.     Despite Plaintiff commuting from Miami to West Palm Beach to be present for the 3:30 pm inspection; The FDEP did not re-appear for the inspection. While on-site Plaintiff performed his own walk through to ensure everything was as it should be for the inspection, and found nothing wrong or out of place.

69.     On April 14th 2021, Plaintiff received an email from Alannah, stating Romina is an FDEP employee and Alannah is her superior. Plaintiff immediately apologized and promised that there will be no more issues moving forward in reference to schedule and/or un-scheduled inspections.

70.     In response to Plaintiff's apology and declaration that the issue would not occur again; Alannah threatened Plaintiff and PropertyOwner1 with violations, fees, and fines (In direct conflict with the FDEP enforcement Manual.

71.     Alannah rescheduled the appointment for 2 days later (April 16th, 2021).

72.     On April 16, 2021, Plaintiff had an unforeseen emergency and as a result had to request that his employee film the inspection for the purposes of continuity of information, transparency, and lastly for Plaintiff to have the ability to redress his government if an issue arises from the inspection.

73.     Romina demanded that Plaintiffs employee stop recording the inspection, and then threatened the employee by stating: If he continues or tries again, he can be arrested for hindering the inspection. The employee stopped recording out of fear of being arrested.

74.     At the end of the inspection Romina did not issue Plaintiff any violations or provide to Plaintiff's employees any verbal recommendations.

75.     On May 19th 2021, FDEP issued Plaintiff 3 violations based on the April 16th, 2021, inspection (Please See Exhibit "E"). All of the issued violations were false and meritless. Plaintiff brought this to the attention of Romina via a telephone conversation Romina advised Plaintiff that she knew that the violations were not valid but encouraged Plaintiff to resolve them anyway due to it being "good practice".

76.     On or about July 17, 2021, Plaintiff resolves all violations and submits all requested documentation to the FDEP as required to return to compliance status.

77.     On July 17th, 2021, Plaintiff contacted the FDEP to ensure that they were in possession of Plaintiffs submissions and to inquire as to when will the facility be placed back in compliance.

78.    Prior to September 1st 2021, Plaintiff was advised that the FDEP-SED wanted to have a conference call (hereinafter, "ConferenceCall") with him and the property owner (PropertyOwner1) on September 1st 2021 Plaintiff agreed to attend the conference call.

79.    <u>On September 1st 2021</u>, Plaintiff, Property Owner, Romina, and Justin were all on the ConferenceCall for the purpose of addressing the outstanding violations and how we could bring the violations to a collective close and move forward.

80.    During this conference call Justin (Unprovoked) raised the issue of Plaintiffs employee recording Romina performing the inspection and advised Plaintiff that recording was not allowed and illegal, and if he attempts to record an inspection again, he will be in violation of hindering an inspection/investigation.

81.    Plaintiff asked Justin if the "no recording policy" was an official department (FDEP) policy Justin responded by stating "it doesn't need to be, it's the law".

82.    Within the same ConferenceCall Plaintiff was informed the FDEP suspects the existence of a new discharge at the LSC-Plant site and further suspects he as the cause of the new discharge. When Plaintiff asked, "Why do you suspect I caused the new discharge", Justin replied; due to the increase in PERC in recent groundwater, and septic tank samples.

83.    <u>Between November 1st 2021 and July 5th 2022</u>, Plaintiff reviewed the ISA, and the SAR's that were submitted to the FDEP by Arcadis after fully reading and then re-reading the ISA, and SAR's Plaintiff decided to call the Arcadis employee, named Douglas J. McGlone (hereinafter, "Douglas") via the telephone number listed on the SAR cover page in hopes of gaining clarity on a series of discrepancies Plaintiff found within Arcadis's SAR.

84.    As Plaintiff began to ask Douglas questions about the discrepancies, Douglas appeared to become a bit agitated and began to divert the conversation by saying; "Those things don't matter,

the real problem is they have a black business owner that didn't give them access. He's basically digging his own grave."

85.     This statement shocked Plaintiff because Plaintiff has never met Douglas, it was at that moment Plaintiff realized that; (1) Douglas was not aware of who he was speaking to on the phone; (2) That some of the difficulties that Plaintiff was dealing with, with the FDEP were racially motivated and extended beyond Alannah, and Romina.

86.     On December 1, 2021, FDEP issued Plaintiff a "Notice of New Discharge and Non-compliance Issues" which accused Plaintiff of causing a new discharge of contamination and of violating state; law(s), statute(s), and administrative code(s). (Please See Exhibit "F").

87.     On February 10, 2022, the FDEP issued Plaintiff an Official Notice of Violation (The first step in an Administrative Action) (Please See Exhibit "G").

88.     On May 4th 2022, Plaintiff was made aware of a criminal investigation that was opened against him by the FDEP.

89.     Plaintiff asked the Staci, what initiated the criminal investigation. Staci replied that the September 10th, 2020, sampling of MW003 and the sediment of the septic tank along with consultation from Arcadis were their basis for launching a formal enforcement effort, and initiating a criminal investigation into Plaintiff.

90.     On May 18, 2022, the FDEP acquired a search warrant with Plaintiff's name on it, and with the assistance of 10 police officers and executed a search of the former LSC-Plant site.

91.     On July 5, 2022, Plaintiff gave notice (via email) to EPA, FDEP, FDEP-SED, DSCP, and WSCS that the LSC-Plant site was a "Dense Non-Aqueous Phase Liquid" (hereinafter, "DNAPL") site, DNAPL is free product as codified in Fla. Administrative Code 62-780.200(20) (Please See Exhibit "H").

92.     And due to the misdiagnosis of the former LSC-Plant site, the site was subsequently
mishandled by Arcadis, EarthTech, and GWP causing the spike in chemical of concern
(hereinafter, "COC") that was found in the groundwater samples dated 9/10/2020 (Arcadis and
GWP), and 10/6/2021 (Arcadis and EarthTech).

93.     On July 7, 2022, an independent firm was contracted (Alpha-Omega Training and
Compliance (hereinafter, "AOTC")), to perform confirmatory sampling of the former LSC-Plant
site, during the sampling event the contractor determined that the site was indeed a DNAPL site
and that a new discharge by Plaintiff was not possible given the evidence.

### 3.0    CONCLUSIONS

The results and findings of this confirmation sampling report for the New LifeStyle Cleaners Site indicate that contamination relevant to historical operation of this site as a dry-cleaning facility remains in exceedance of applicable FDEP SCTLs or GCTLs in the onsite soil and groundwater. The results of the analysis of septic tank sediments indicate an advanced stage of the reductive dechlorination of PCE to daughter products cis-1,2-DCE and Vinyl Chloride.

Additionally, the levels of PCE and TCE within the septic sediments is significantly lower than the levels reported in the analysis of the surrounding groundwater indicating the leaching of source material over a long period of time or the influx of the surrounding contaminated groundwater becoming trapped within the septic tank sediments as opposed to a recent discharge.

No evidence of additional or more recent releases of PCE have been discovered. Recent discharges of PCE resulting from operations at the New LifeStyle Cleaners site would have resulted in significantly higher concentrations of PCE and possibly TCE in the septic tank sediments indicating earlier stage reductive dechlorination.

94.     The Discharge or other condition of pollution caused by Arcadis and GWP during their
well development from (December 2018) to (January 2019) is the cause of the spike in MW003
(monitoring well 3) within the row dated "9/10/2020" (Please See Exhibit "I")

95.     The Discharge or other condition of pollution caused by Arcadis and EarthTech during their well development from (September (9 to 10) 2020) can be found on MW006-007 (monitoring wells 006 & 007) within the rows dated "10/6/2021". (Please See Exhibit "I")

96.     A common test (Rule of Thumb) used to pre-determine if there may be DNAPL at a site is the 1% rule.

97.     Take 1% of the water solubility of the chemical of concern, and if any monitoring well sample exceeds this number, there is a high probability of DNAPL and the site (for safety purposes) should be reclassified and treated/handled differently.

98.     The water solubility of perc is 150,000 ug/L at 77 degrees Fahrenheit, 1% of 150,000 is 1,500 ug/L.

99.     The PCE (Perc) sample from monitoring well 3 (MW003) on January 11, 2019, as listed in exhibit H was 1,680 ug/L, this is 180 ug/L higher than the threshold for recharacterization of the site.

100.    As a result of this "oversight" several monitoring wells were developed in the heart of a DNAPL plume violating several federal, state, and local laws.

101.    By virtue of the well(s) presence in a DNAPL zone, the wells serve as a conduit (back-channel) leading dangerous carcinogens into Florida's water supply.

102.    One of the tell-tell signs (or red flags) of a well being constructed in a DNAPL zone is a sudden spike of the chemical of concern in the next sampling event after its development.



103.   The spike is not uniform across the board, it will be in relation to each wells distance from the heart of the DNAPL zone and groundwater flow, as outline below.



104.    The closer the well is to the DNAPL source equals a more sudden, and sharp spike, visible in MW003 on 9/10/2020 compared to MW003 1/11/2019 (Please See Exhibit "I", and the first graph in the picture above).

105.    The further away the well is to the DNAPL source equals a longer period of time before the increase and a more subtle spike (increase).

106.    <u>To date</u>: The FDEP has an Open but stagnant Civil, and criminal investigation into Plaintiff, both investigations have generated undue and unjust hardships for Plaintiff, and he desires to reopen his business but lives in fear of further retaliation from the FDEP and has a tarnished reputation within the community, and Dry Cleaning community as a result of these ongoing controversies.

107.    Plaintiff has been forced to forego a series of gainful, investments opportunities, business opportunities/ventures, and even employment opportunities and with each iteration of the aforementioned opportunities lost Plaintiff suffers personal injuries to his mental and emotional health, economically (both known and unknown) and an inability to provide for what matters most to Plaintiff (his family).

## COUNT I
## STRICT LIABILITY (FIRST DRILLING EVENT)
### Pursuant to Fla. Stat. § 376.313 v. Arcadis

108.    Plaintiff incorporates be reference the jurisdiction and venue in paragraphs (1-2), the parties contained in paragraphs (3, 8), the allegations contained in paragraphs (25-36 & 91-105) as if stated fully and further alleges as follows:

109.    Fla. Stat. § 376.313(3) creates a private cause-of-action "for all damages resulting from a discharge or other condition of pollution covered under Fla. Stat. §§ 376.30 through 376.317".

110.    Fla. Stat. § 376.313(3) therefore provides the substantive law and rule for the adjudication of this matter.

111.    *Fla. Stat. § 376.301(29)* defines *"person"* as *"any individual, partner, joint venture, or corporation; any group of the foregoing, organized or united for a business purpose; or any governmental entity."*

112.    Arcadis is a corporation with its main office located in Highland Ranch, Colorado and is authorized to conduct business in the state of Florida and therefore is a "person" as that word is defined in Fla. Stat. § 376.301(29).

113.    As a "person" Arcadis may be held jointly or severally liable for all-damages as the result of violation(s) covered under  Fla. Stat. §§ 376.30 through 376.317 pursuant to Fla. Stat. § 376.313(3).

114.    Plaintiff is an individual and therefore is a "person" as that word is defined in Fla. Stat. § 376.301(29).

115.    As a "person" Plaintiff is authorized to bring this cause-of-action against Arcadis for all-damages suffered as a result of violation(s) covered under  Fla. Stat. §§ 376.30 through 376.317 pursuant to Fla. Stat. § 376.313(3).

116. Arcadis' negligent, act(s), supervision, analyses, design and omission(s) during the development of monitoring wells at the LSC-plant site between the period of (December 2018) and (January 2019), is the direct and proximate cause of discharge or "other conditions of pollution" (as described in Fla. Stat. §§ 376.30 through 376.317) at the LSC-Plant site.

117. None of the negligent act(s), analyses, and omission(s) were authorized pursuant to Chapter 403, and in many ways violated numerous state law(s), including (but not limited to):

    a.) Discharge pollutants or hazardous substances into or upon the surface or ground waters of the state or lands, which discharge violates any departmental "standard" as defined in s. 403.803(13).        *-Fla. Stat. § 376.302(1)(a)*

    b.) To fail to obtain any permit or registration required by this chapter or by rule, or to violate or fail to comply with any statute, rule, order, permit, registration, or certification adopted or issued by the department pursuant to its lawful authority.

        *-Fla. Stat. § 376.302(1)(b)*

    c.) Makes any false statement or representation or knowingly omits material information in any hazardous waste application, label, manifest, record, report, permit, or other document required by this act;.        *-Fla. Stat. § 403.727(3)(b)(3)*

    d.) Cause, authorize, create, suffer, or allow an imminent hazard to occur or continue;

        *-Fla. Stat. § 403.727(1)(d)*

    e.) Failure to immediately remediate, contain, remove, and abate the discharges.

        *-Fla. Stat. § 376.305(1)*

    f.) Contaminant Cleanup Target Goals & Contaminated Site Cleanup Goals;

        *-62-777 & 62-780 Florida Administrative Code(s)*

118.   *"[i]t is not necessary for such person to plead or prove negligence in any form or manner. Such person need only plead and prove the fact of the prohibited discharge or other pollutive condition and that it has occurred."*   -Fla. Stat. § 376.313(3)

119.   Proof of the occurrence of the prohibited discharge (or other pollutive condition) can be found on Exhibit "I".

120.   As a direct, proximate, and foreseeable result of this discharge (or other condition of pollution) the FDEP accused, and subsequently treated Plaintiff as if he was conducting his business in a grossly negligent, and illegal fashion.

121.   This treatment created tension, contention, confusion, and turmoil within Plaintiff's professional and personal life, and

122.   Resulting in Plaintiff being perceived, and subsequently treated as the responsible party of the discharge or "condition of pollution" at the LSC-Plant site;

123.   The only defenses available to Arcadis for a claim under Fla. Stat. § 376.313(3) are those set forth in Fla. Stat. §376.308.

124.    Arcadis cannot meet its burden of establishing any of the defenses available under Fla. Stat. § 376.308.

125.   Therefore, Arcadis is strictly liable to Plaintiff for all-damages resulting from the discharge or "other condition of pollution" covered under Fla. Stat. §§ 376.30 through 376.319.

WHEREFORE, Plaintiff demands trial by jury against Arcadis for an amount to be determined at trial by a jury for all-damages, and punitive damages[3] (Pursuant to Fla. Stat. § 768.62), cost of suit, and any further relief as the court deems appropriate.

---

[3] Plaintiff has clear and convincing evidence to support a claim for punitive damages against Arcadis.

## COUNT II
## STRICT LIABILITY (FIRST DRILLING EVENT)
### Pursuant to Fla. Stat. § 376.313 v. GWP

126.　Plaintiff incorporates be reference the jurisdiction and venue in paragraphs (1-2), the parties contained in paragraphs (3, 9), the allegations contained in paragraphs (25-36 & 91-105) as if stated fully and further alleges as follows:

127.　Fla. Stat. § 376.313(3) creates a private cause-of-action "for all damages resulting from a discharge or other condition of pollution covered under Fla. Stat. §§ 376.30 through 376.317".

128.　Fla. Stat. § 376.313(3) therefore provides the substantive law and rule for the adjudication of this matter.

129.　*Fla. Stat. § 376.301(29)* defines *"person"* as *"any individual, partner, joint venture, or corporation; any group of the foregoing, organized or united for a business purpose; or any governmental entity."*

130.　GWP is a corporation with its main office located in Orlando, Florida and therefore is a "person" as that word is defined in Fla. Stat. § 376.301(29).

131.　As a "person" GWP may be held jointly or severally liable for all-damages as the result of violation(s) covered under  Fla. Stat. §§ 376.30 through 376.317 pursuant to Fla. Stat. § 376.313(3).

132.　Plaintiff is an individual and therefore is a "person" as that word is defined in Fla. Stat. § 376.301(29).

133.　As a "person" Plaintiff is authorized to bring this cause-of-action against GWP for all-damages suffered as a result of violation(s) covered under  Fla. Stat. §§ 376.30 through 376.317 pursuant to Fla. Stat. § 376.313(3).

134.    GWP negligent, act(s), omission(s), and performance during the development of monitoring wells at the LSC-plant site between the period of (December 2018) and (January 2019), is the direct and proximate cause of discharge or "other conditions of pollution" (as described in Fla. Stat. §§ 376.30 through 376.317) at the LSC-Plant site.

135.    None of the negligent, act(s), omission(s), and performance were authorized pursuant to Chapter 403, and in many ways violated numerous state law(s), including (but not limited to):

   a.) Discharge pollutants or hazardous substances into or upon the surface or ground waters of the state or lands, which discharge violates any departmental "standard" as defined in s. 403.803(13).                              *-Fla. Stat. § 376.302(1)(a)*

   b.) To fail to obtain any permit or registration required by this chapter or by rule, or to violate or fail to comply with any statute, rule, order, permit, registration, or certification adopted or issued by the department pursuant to its lawful authority.

                                                              *-Fla. Stat. § 376.302(1)(b)*

   c.) Makes any false statement or representation or knowingly omits material information in any hazardous waste application, label, manifest, record, report, permit, or other document required by this act;.        *-Fla. Stat. § 403.727(3)(b)(3)*

   d.) Cause, authorize, create, suffer, or allow an imminent hazard to occur or continue;

                                                              *-Fla. Stat. § 403.727(1)(d)*

   e.) Failure to immediately remediate, contain, remove, and abate the discharges.

                                                              *-Fla. Stat. § 376.305(1)*

   f.) Contaminant Cleanup Target Goals & Contaminated Site Cleanup Goals;

                                                   *-62-777 & 62-780 Florida Administrative Code(s)*

136.   "*[i]t is not necessary for such person to plead or prove negligence in any form or manner. Such person need only plead and prove the fact of the prohibited discharge or other pollutive condition and that it has occurred.*"   *-Fla. Stat. § 376.313(3)*

137.   Proof of the occurrence of the prohibited discharge (or other pollutive condition) can be found on Exhibit "I".

138.   As a direct and proximate result of this discharge (or other condition of pollution) the FDEP accused, and subsequently treated Plaintiff as though he was conducting his business in a grossly negligent, and illegal fashion.

139.   This treatment created tension, contention, confusion, and turmoil within Plaintiff's professional and personal life, and

140.   Resulting in Plaintiff being perceived, and subsequently treated as the responsible party of the discharge or "condition of pollution" at the LSC-Plant site;

141.   The only defenses available to GWP for a claim under Fla. Stat. § 376.313(3) are those set forth in Fla. Stat. §376.308.

142.   GWP cannot meet its burden of establishing any of the defenses available under Fla. Stat. § 376.308.

143.   Therefore, GWP is strictly liable to Plaintiff for all-damages resulting from the discharge or "other condition of pollution" covered under Fla. Stat. §§ 376.30 through 376.319.

WHEREFORE, Plaintiff demands trial by jury against GWP for an amount to be determined at trial by a jury for all-damages, cost of suit, and any further relief as the court deems appropriate.

## COUNT III
## <u>STRICT LIABILITY (SECOND DRILLING EVENT)</u>
### *Pursuant to Fla. Stat. § 376.313 v. ARCADIS*

97.     Plaintiff incorporates be reference the jurisdiction and venue in paragraphs (1-2), the parties contained in paragraphs (3, 8), the allegations contained in paragraphs (25-56 & 91-105) as if stated fully and further alleges as follows:

98.     Fla. Stat. § 376.313(3) creates a private cause-of-action "for all damages resulting from a discharge or other condition of pollution covered under Fla. Stat. §§ 376.30 through 376.317".

99.     Fla. Stat. § 376.313(3) therefore provides the substantive law and rule for the adjudication of this matter.

100.    *Fla. Stat. § 376.301(29)* defines *"person"* as "any individual, partner, joint venture, or corporation; any group of the foregoing, organized or united for a business purpose; or any governmental entity."

101.    Arcadis is a corporation with its main office located in Highland Ranch, Colorado and is authorized to conduct business in the state of Florida and therefore is a "person" as that word is defined in Fla. Stat. § 376.301(29).

102.    As a "person" Arcadis may be held jointly or severally liable for all-damages as the result of violation(s) covered under Fla. Stat. §§ 376.30 through 376.317 pursuant to Fla. Stat. § 376.313(3).

103.    Plaintiff is an individual and therefore is a "person" as that word is defined in Fla. Stat. § 376.301(29).

104.    As a "person" Plaintiff is authorized to bring this cause-of-action against Arcadis for all-damages suffered as a result of violation(s) covered under  Fla. Stat. §§ 376.30 through 376.317 pursuant to Fla. Stat. § 376.313(3).

105.    Arcadis' negligent, act(s), supervision, analyses, design and omission(s) during the development of monitoring wells at the LSC-plant site between the period of (September (9 through 10) 2020) is the direct and proximate cause of discharge or "other conditions of pollution" (as described in Fla. Stat. §§ 376.30 through 376.317) at the LSC-Plant site.

106.    None of the negligent act(s), analyses, and omission(s) were authorized pursuant to Chapter 403, and in many ways violated numerous state law(s), including (but not limited to):

   a.) Discharge pollutants or hazardous substances into or upon the surface or ground waters of the state or lands, which discharge violates any departmental "standard" as defined in s. 403.803(13).                    *-Fla. Stat. § 376.302(1)(a)*

   b.) To fail to obtain any permit or registration required by this chapter or by rule, or to violate or fail to comply with any statute, rule, order, permit, registration, or certification adopted or issued by the department pursuant to its lawful authority.

   *-Fla. Stat. § 376.302(1)(b)*

   c.) Makes any false statement or representation or knowingly omits material information in any hazardous waste application, label, manifest, record, report, permit, or other document required by this act;.          *-Fla. Stat. § 403.727(3)(b)(3)*

   d.) Cause, authorize, create, suffer, or allow an imminent hazard to occur or continue;

   *-Fla. Stat. § 403.727(1)(d)*

   e.) Failure to immediately remediate, contain, remove, and abate the discharges.

   *-Fla. Stat. § 376.305(1)*

   f.) Contaminant Cleanup Target Goals & Contaminated Site Cleanup Goals;

   *-62-777 & 62-780 Florida Administrative Code(s)*

107.   "[i]t is not necessary for such person to plead or prove negligence in any form or

manner. Such person need only plead and prove the fact of the prohibited discharge

or other pollutive condition and that it has occurred."

*-Fla. Stat. § 376.313(3)*

144.   Proof of the occurrence of the prohibited discharge (or other pollutive condition) can be

found on Exhibit "I".

109.   As a direct and proximate result of this discharge (or other condition of pollution) the FDEP

accused, and subsequently treated Plaintiff as though he was conducting his business in a grossly

negligent, and illegal fashion.

110.   This treatment created tension, contention, confusion, and turmoil within Plaintiff's

professional and personal life, and

111.   Resulting in Plaintiff being perceived, and subsequently treated as the responsible party of

the discharge or "condition of pollution" at the LSC-Plant site;

112.   The only defenses available to Arcadis for a claim under Fla. Stat. § 376.313(3) are those

set forth in Fla. Stat. §376.308.

113.    Arcadis cannot meet its burden of establishing any of the defenses available under Fla.

Stat. § 376.308.

114.    Therefore, Arcadis is strictly liable to Plaintiff for all-damages resulting from the discharge

or "other condition of pollution" covered under Fla. Stat. §§ 376.30 through 376.319.

WHEREFORE, Plaintiff demands trial by jury against Arcadis for an amount to be

determined at trial by a jury for all-damages, and punitive damages (Pursuant to Fla. Stat. §

768.62), cost of suit, and any further relief as the court deems appropriate.

### COUNT IV
### STRICT LIABILITY (SECOND DRILLING EVENT)
#### Pursuant to Fla. Stat. § 376.313 v. EARTHTECH

145.    Plaintiff incorporates be reference the jurisdiction and venue in paragraphs (1-2), the parties contained in paragraphs (3, 10), the allegations contained in paragraphs (25-56 & 91-105) as if stated fully and further alleges as follows:

146.    Fla. Stat. § 376.313(3) creates a private cause-of-action "for all damages resulting from a discharge or other condition of pollution covered under Fla. Stat. §§ 376.30 through 376.317".

147.    Fla. Stat. § 376.313(3) therefore provides the substantive law and rule for the adjudication of this matter.

148.    *Fla. Stat. § 376.301(29)* defines *"person"* as *"any individual, partner, joint venture, or corporation; any group of the foregoing, organized or united for a business purpose; or any governmental entity."*

149.    Earthtech is a corporation with its main office located in Pompano, Florida and therefore is a "person" as that word is defined in Fla. Stat. § 376.301(29).

150.    As a "person" Earthtech may be held jointly or severally liable for all-damages as the result of violation(s) covered under  Fla. Stat. §§ 376.30 through 376.317 pursuant to Fla. Stat. § 376.313(3).

151.    Plaintiff is an individual and therefore is a "person" as that word is defined in Fla. Stat. § 376.301(29).

152.    As a "person" Plaintiff is authorized to bring this cause-of-action against Earthtech for all-damages suffered as a result of violation(s) covered under  Fla. Stat. §§ 376.30 through 376.317 pursuant to Fla. Stat. § 376.313(3).

31

153.    Earthtech's negligent, act(s), supervision, analyses, and omission(s) during the development of monitoring wells at the LSC-plant site between the period of (September (9 through 10) 2020) is the direct and proximate cause of discharge or "other conditions of pollution" (as described in Fla. Stat. §§ 376.30 through 376.317) at the LSC-Plant site. None of the negligent, act(s), omission(s), and performance were authorized pursuant to Chapter 403, and in many ways violated numerous state law(s), including (but not limited to):

1.  Discharge pollutants or hazardous substances into or upon the surface or ground waters of the state or lands, which discharge violates any departmental "standard" as defined in s. 403.803(13).                                   *-Fla. Stat. § 376.302(1)(a)*

2.  To fail to obtain any permit or registration required by this chapter or by rule, or to violate or fail to comply with any statute, rule, order, permit, registration, or certification adopted or issued by the department pursuant to its lawful authority.

    *-Fla. Stat. § 376.302(1)(b)*

3.  Makes any false statement or representation or knowingly omits material information in any hazardous waste application, label, manifest, record, report, permit, or other document required by this act;.          *-Fla. Stat. § 403.727(3)(b)(3)*

4.  Cause, authorize, create, suffer, or allow an imminent hazard to occur or continue;

    *-Fla. Stat. § 403.727(1)(d)*

5.  Failure to immediately remediate, contain, remove, and abate the discharges.

    *-Fla. Stat. § 376.305(1)*

6.  Contaminant Cleanup Target Goals & Contaminated Site Cleanup Goals;

    *-62-777 & 62-780 Florida Administrative Code(s)*

154.    "*[i]t is not necessary for such person to plead or prove negligence in any form or manner. Such person need only plead and prove the fact of the prohibited discharge or other pollutive condition and that it has occurred.*"       *-Fla. Stat. § 376.313(3)*

155.    Proof of the occurrence of the prohibited discharge (or other pollutive condition) can be found on Exhibit "I".

156.    As a direct and proximate result of this discharge (or other condition of pollution) the FDEP accused, and subsequently treated Plaintiff as though he was conducting his business in a grossly negligent, and illegal fashion.

157.    This treatment created tension, contention, confusion, and turmoil within Plaintiff's professional and personal life, and

158.    Resulting in Plaintiff being perceived, and subsequently treated as the responsible party of the discharge or "condition of pollution" at the LSC-Plant site;

159.    The only defenses available to Earthtech for a claim under Fla. Stat. § 376.313(3) are those set forth in Fla. Stat. §376.308.

160.    Earthtech cannot meet its burden of establishing any of the defenses available under Fla. Stat. § 376.308.

161.    Therefore, Earthtech is strictly liable to Plaintiff for all-damages resulting from the discharge  or "other condition of pollution" covered under Fla. Stat. §§ 376.30 through 376.319.

WHEREFORE, Plaintiff demands trial by jury against Earthtech for an amount to be determined at trial by a jury for all-damages, cost of suit, and any further relief as the court deems appropriate.

### COUNT V
### <u>CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS</u>
*(Fourteenth Amendment (Equal Protection))*
*v. Arcadis, Jason, Alannah & Romina*

162.    Plaintiff incorporates be reference the jurisdiction and venue in paragraphs (1-2), the parties contained in paragraphs (3, 4, 5, 6, 8), the allegations contained in paragraphs (36-90) as if stated fully and further alleges as follows:

163.    This cause-of-action arises from a series of interactions between Plaintiff, Arcadis, Jason, Alannah and Romina between 4/1/2021 thru 2/10/2022.

164.    On or about April 13th, 2021, Jason, Alannah and Romina conspired (entered into an agreement) together due to a mutual racial animus toward African Americans with a heightened distain for those (African Americans) who are not subservient to their perceived authority to harm Plaintiff.

### <u>The overt acts performed in furtherance of this conspiracy were:</u>

#### *Phase I – Place Plaintiff Out-of-Compliance*

165.    On April 16th, 2021, Romina performed an inspection at the LSC-Plant site and issued Plaintiff a series of false violation(s) that were known to be false,

154.    Plaintiff communicated the inaccuracies but was advised "It's good practice".

154.    On July 22nd, 2021, while on a conference call with the FDEP at the end of the call Plaintiff was advised this matter can be resolved in a few days, maybe weeks after Plaintiff submits photo(s) of the resolve violations.

155.    Plaintiff resolved the false violation(s) and was left in "Non-Compliance" status.

#### *Phase II – Keep Plaintiff in Non-Compliance Status*

156.　　　　　After Plaintiff resolved the false violations issued against him by Romina, Alannah deliberately, and recklessly sustained Plaintiff in a "Non-Compliance" status, despite being aware of the resolution of the violations.

157.　　　　　Plaintiff emailed Alannah for an update on the timeline, as to when the facility may be placed back into compliance and was advised on August 23, 2021, by Alannah "The FDEP has 300 days" to place Plaintiff back into compliance, this is an untrue statement, and is not supported by any FDEP policy or procedure.

158.　　　　　Prior to September 1st, 2021, Arcadis participated in a conference call with the FDEP for the purpose of analyzing the spike in chemicals at the LSC-Plant site.

159.　　　　　Douglas the Arcadis representative recognized the conspiracy to harm Plaintiff and aided in the conspiracy by withholding valuable and exculpatory; information, data, and possibilities.

### *Phase III – Initiate an Administrative Action v. Plaintiff*

160.　　　　　Jason knew or should have known as a result of his participation within the communication thread which proceeded February 2022, the disparaging treatment Plaintiff was being subjected to;

161.　　　　　Nonetheless on February 10th, 2022, Jason issued Plaintiff the Official "Notice of Violation" (The first step in an Administrative Action) letter via certified mail.

161.　　At all times material Plaintiff was enrolled in the Dry Cleaner Solvent Clean Up Program, and was entitled to the Liability Protection provided by Fla. Stat. Section 376.3078(3)(a);

*[a] real property owner, nearby real property owner, or person who owns or operates, or who otherwise could be liable as a result of the operation of, a drycleaning facility or a wholesale supply facility is not liable for or subject to administrative or judicial action brought*

> *by or on behalf of any state or local government or agency thereof*
> *or by or on behalf of any person to compel rehabilitation or pay for*
> *the costs of rehabilitation of environmental contamination resulting*
> *from the discharge of drycleaning solvents.* *(Underlines added)

162. Despite Plaintiff's immunities and liability protections provided by the Dry Cleaner Solvent CleanUp Program.

163. Arcadis, Jason, Alannah, and Romina recklessly, knowingly, maliciously, and above all intentionally subjected Plaintiff to a deprivation of his right of equal protection of the laws of the United States (secured by the constitution).

## Similarly Situated

164. Arcadis is similarly situated with Plaintiff in relation to this immediate action and in many ways would make a more sensible culprit for the FDEP to consider due to:

165. The absence of liability protection,

166. The mandatory 1-million-dollar general liability policy Arcadis must carry,

167. Arcadis' history of causing this exact same discharge and damage at another remediation site.

168. Yet, rather than investigate Arcadis, and/or issue Arcadis a violation, and/or subject Arcadis to an Administrative action; Jason, Alannah, and Romina decided to discriminate against Plaintiff with zero evidence of wrongdoing.

169. To achieve their goals these individuals violated Plaintiff's; procedural due process, substantive due process, and equal protection rights afforded to him by the fourteenth amendment.

170. As a direct, proximate, and foreseeable result of Arcadis, Jason, Alannah, and Romina conspiracy to harm Plaintiff, and all of the acts, omissions, and obfuscations in furtherance thereof;

Plaintiff has suffered personal injury in the form of mental and emotional anguish, humiliation, embarrassment, damage to his reputation, and his standing within the community.

WHEREFORE, Plaintiff, demands trial by jury for judgement against Arcadis, Jason, ALANNAH, and Romina pursuant to 42 U.S.C. § 1985(3) for general damages, special damages, and punitive damages (in an amount to discourage similar behavior in the future) for an amount to be determined at trial by a jury, plus cost of pursuing this action pursuant to 42 U.S.C. § 1988, and any additional relief as the court deem appropriate.

### COUNT VI
### ACTION FOR NEGLECT TO PREVENT
#### 42 U.S.C. § 1986 v. Staci

171.   Plaintiff incorporates be reference the jurisdiction and venue in paragraphs (1-2), the parties contained in paragraphs (3, 7), emails contained in exhibits (J, K, L), and the allegations contained in paragraphs (36 to 90) as if stated fully and further alleges as follows:

172.   On June 28, 2022, Plaintiff composed an email (hereinafter, "Email") to Staci within this email Plaintiff communicated his frustrations with the manner he has been discriminated by the FDEP in hopes that Staci[4] would recognize the discrimination and its implications and would intervene to assist in ending the undeserved punishment that Plaintiff was being subjected to.

173.   Staci replied to Plaintiff's email with enough substance to demonstrate she read the email, yet the response contained zero acknowledgement of Plaintiff's alleged abuse.

174.   On July 5, 2022, Plaintiff replied to the Email with an email that outlined in much detail all the technical errors that the FDEP had within their understanding of hazardous waste and the mistakes that were made in the LSC-site characterization.

---

[4] As an attorney who was well versed in the law.

175.    In hopes of finally bringing this matter to a close and demonstrating it was not possible for the FDEP to have a preponderance-of-evidence against Plaintiff when Plaintiff has clear-and-convincing-evidence against Arcadis culpability for the spike of perchloroethylene.

176.    On Oct 1, 2022, Plaintiff replied to the Email venting his frustration and disappointment with the EPA, and FDEP and their lack of care for the environment, and above all Plaintiff, and pleaded for some assistance in understanding why the departure from standard protocol and procedures.

177.    Plaintiff was very deliberate and intentional to communicate to Staci via email that he has a learning disability and would greatly appreciate some additional assistance toward pausing, and/or understanding why this abuse and/or process was taking place.

178.    But despite Plaintiff pleas for assistance, Staci being aware of the discrimination and/or abuse, while being in a position to prevent the abuse, or aide in its prevention made a decision to allow it to continue.

179.    As a direct and proximate result of Staci's reckless indifference, negligence, and failure to prevent or aid in the prevention of the abuse Plaintiff suffered personal injuries in the form of mental and emotional anguish, embarrassment, humiliation, damage to reputation, and damage to Plaintiff's standing within the community.

WHEREFORE, Plaintiff, demands trial by jury for judgement against Staci pursuant to 42 U.S.C. § 1986 for general damages, special damages, and punitive damages (in an amount to discourage similar behavior in the future) for an amount to be determined at trial by a jury, plus cost of pursuing this action pursuant to 42 U.S.C. § 1988, and any additional relief as the court deem appropriate.

## **PRAYER FOR RELIEF**

Plaintiff has exhausted all administrative remedies/options, and prays, that this prayer for relief can bring-about some awareness and change.

WHEREFORE, Plaintiff demands trial by jury for all issues so triable against ALL defendants in the above-style action.

Dated this 1st day of June, 2023

By: _____

Marc M. Dulcio • *Pro Se* Litigant

**Marc M. Dulcio**

70 N.E. 131st Street

North Miami, FL 33161

Cellphone: (561) 660-4855

Primary Email Address:

MarcDulcio@Hotmail.com

## **CERTIFICATE OF COMPLIANCE WITH RULE 11 (b)**

I, Marc M. Dulcio certify this filing is in accordance with Federal Rule of Civil Procedure Rule 11 (b)[5], and therefore *(1)* not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation *(2)* the claim(s), defense(s), and other legal contention(s) are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law, *(3)* the factual contention(s) have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and *(4)* the denials of factual contention(s) are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

By: _____

*Marc M. Dulcio • Pro Se Litigant*

---

[5] FRCP Rule 11 (b) Representations to the Court. By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances.