**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 9:22-CV-81908-ROSENBERG/REINHART**

MARC M. DULCIO,

      Plaintiff,

v.

ARCADIS U.S., INC., *et al.*,

      Defendants.

_____/

**OMNIBUS ORDER ON MOTIONS TO DISMISS SECOND AMENDED COMPLAINT**

    This cause is before the Court on the following Motions to Dismiss:

1. Defendant Arcadis U.S., Inc.'s ("Arcadis") Motion to Dismiss Second Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) [DE 77];

2. Defendants Jason Andreotta ("Andreotta"), Alannah Irwin ("Irwin"), Staci Kichler ("Kichler"), and Romina Lancellotti's ("Lancellotti") (collectively "FDEP Individual Defendants") Motion to Dismiss Second Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) [DE 78];

3. Defendant Earth Tech Drilling, Inc.'s ("Earth Tech") Motion to Dismiss Second Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) [DE 79];

4. Defendant GPI Properties, Inc.'s ("GPI") Motion to Dismiss Second Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) [DE 86].

Plaintiff, Marc M. Dulcio, filed responses to the Motions, DE 83-85, 87, and Defendants filed replies. DE 88-89, 92-94. As set forth below, the Motions are granted in part and denied in part.

**I.      BACKGROUND AND FACTUAL ALLEGATIONS**

    Plaintiff, who is proceeding *pro se*, filed his original Complaint, [DE 1], on December 9, 2022, then filed his Amended Complaint on January 3, 2023, before any motion practice ensued.

DE 7. The Amended Complaint asserted 13 claims against 22 Defendants. *Id.* All Defendants moved to dismiss the Amended Complaint, and, after a lengthy analysis, the Court dismissed some claims with prejudice and some claims without prejudice, and gave Plaintiff leave to file a Second Amended Complaint consistent with the Court's Order. DE 74. In that Order, the Court specifically explained to Plaintiff that he needed to allege specific acts and omissions regarding specific Defendants in support of each claim, to include only those Defendants against whom he has legally cognizable claims, to allege precise facts identifying the particular constitutional right that was violated, and to explain how the violation fell outside the scope of the Defendant's duties. *Id.* at 37-38. In the Second Amended Complaint, DE 75, Plaintiff narrowed his claims and reduced the number of Defendants, and now asserts six claims against seven Defendants:

Count I: Violation of Florida Statutes § 376.313 against Arcadis;

Count II: Violation of Florida Statutes § 376.313 against GPI;

Count III: Violation of Florida Statutes § 376.313 against Arcadis;

Count IV: Violation of Florida Statutes § 376.313 against Earth Tech;

Count V: Conspiracy to Interfere With Civil Rights in Violation of 42 U.S.C. § 1985 against Arcadis, Andreotta, Irwin, and Lancellotti; and

Count VI: Action for Neglect to Prevent in Violation of 42 U.S.C. § 1986 against Kichler.

The allegations below are taken from the Complaint and accepted as true for purposes of the Motions.

Sometime before December 2017, the Florida Department of Environmental Protection ("FDEP") assigned Arcadis to perform an Initial Site Assessment of the dry-cleaning site ("LSC Plant") that Plaintiff later purchased. DE 75 ¶ 31. Arcadis was responsible for recognizing that the

LSC Plant should be classified as a "DNAPL[1] site" at that time and reporting that characterization to FDEP. *Id.* ¶¶ 32-34. From December 3, 2018, to January 11, 2019, Arcadis and GPI performed a site assessment. *Id.* ¶ 35. Prior to drilling, Arcadis and GPI failed to perform a proper underground survey, which resulted in Arcadis and GPI damaging pipes leading to and from the LSC Plant's septic tanks. *Id.* ¶¶ 35-36.

On June 5, 2019, Plaintiff acquired the Life Style Cleaners dry cleaning business and equipment "for zero dollars and secured 9 months of free rent, and sign[ed] a lease agreement to lease the LSC-Plant site for 5 years." *Id.* ¶ 37.  On or about July 25, 2019, FDEP employees performed a compliance evaluation of the LSC Plant, at which Irwin was present. *Id.* ¶ 39.  Irwin did not issue any violations and Plaintiff was given one recommendation, and also advised to complete various registrations. *Id.* ¶¶ 39, 43. During the inspection, Irwin made an incorrect statement relating to perchloroethylene ("PERC"), apparently telling Plaintiff to dispose of the PERC rather than its byproduct. *Id.* ¶ 40. When Plaintiff alerted Irwin to the mistake, she "became irate," "proceeded to double down on her assertions," and became "increasingly agitated with Plaintiff." *Id.* ¶ 41.

Following the inspection, Plaintiff called FDEP "to confirm if the false information he received from [Irwin] was correct" and spoke with Irwin's supervisor, "Norva." *Id.* ¶ 44. Norva "agreed with Plaintiff that PERC does not expire and contended that Plaintiff may have misunderstood and/or misheard [Irwin]. *Id.* ¶ 45. Plaintiff reiterated that he did not misunderstand and asked to file a complaint against Irwin; Norva assured Plaintiff that a complaint was not necessary and she would attend to Irwin. *Id.* ¶¶ 45-46.

---

[1] DNAPL is defined by the United States Department of Environmental Protection as Dense Non-Aqueous Phase Liquid contaminated sites.

On September 19, 2019, Plaintiff received a warning letter from FDEP stating that he failed to rectify violations that were verbally brought to his attention during the inspection, including "[f]ailure to provide secondary containment for the chemicals on the shelving units adjacent to the perchloroethylene storage area, pursuant to sub-section 376.3078(9)(a) F.S." *Id.* ¶ 47. However, Irwin never verbally communicated this violation to Plaintiff during the inspection. *Id.* ¶ 49. The letter also referenced possible and potential violations that Plaintiff would need to correct so that he would not be further in violation. *Id.* ¶ 50.  Plaintiff again called Norva, who advised Plaintiff not to worry about the violation and to perform maintenance of the dry cleaning machine. *Id.* ¶ 52.

During the July 25, 2019 inspection, Irwin and John Bryant informed Plaintiff that inspections are never spontaneous and that the FDEP would always call to schedule an inspection. *Id.* ¶ 53. Over a year later, on September 9, 2020, and September 10, 2020, Arcadis and Earth Tech began drilling at the LSC Plant without performing a proper survey, and "punctured and/or further damaged the pipes located at the LSC-Plant site causing additional soil contamination to leech into the septic tank, and creating an additional pathway for contamination to enter into the groundwater." *Id.* ¶ 55.

On or about March 25, 2021, an inspection was requested to be performed to verify the status of the facilities. *Id.* ¶ 56.  The week prior to April 13, 2021, Plaintiff observed an FDEP vehicle in the LSC Plant parking lot on two occasions, but no one ever exited the vehicle. *Id.* ¶ 58. Then, on April 13, Plaintiff was absent from the site when the FDEP vehicle returned and Lancellotti appeared on the site. *Id.* ¶ 59.  Lancellotti entered the building and demanded to perform an inspection; however, neither Plaintiff nor his manager was aware of an inspection being scheduled. *Id.* ¶ 60. Given Irwin's past statements that FDEP would always schedule inspections

in advance, the fact that Plaintiff had never met Lancellotti, and that Lancellotti did not present a credential, Plaintiff was "apprehensive" about the inspection's legitimacy and asked if the inspection could be rescheduled. *Id.* Lancellotti stated that if Plaintiff did not grant her immediate access, he would be guilty of hindering an investigation and would be issued violations for other offenses. *Id.* ¶¶ 61-63. When Plaintiff advised Lancellotti that he could not grant access at that moment, Lancellotti "became very irate" and referred to Plaintiff by "Sucio," which is a "derogative racial slur within the Spanish speaking community." *Id.* ¶ 64. Plaintiff asked Lancellotti to stop speaking to him in such a manner, and Lancellotti complied; Plaintiff and his manager arranged for the inspection to be conducted later that afternoon, but Lancellotti did not appear at the site. *Id.* ¶¶ 65-68.

On April 14, 2021, Plaintiff received an email from Irwin stating that Lancellotti is an FDEP employee and Irwin is her superior, and Plaintiff apologized and promised no further issues with future inspections. *Id.* ¶ 69. In response, Irwin threatened Plaintiff with violations, fees, and fines, in violation of the FDEP enforcement manual. *Id.* ¶ 70. On April 16, 2021, Lancellotti performed another inspection. Because Plaintiff could not attend, he asked his employee to record the inspection, but Lancellotti threatened the employee with arrest if he continued recording. *Id.* ¶¶ 72-73.  At the end of the inspection, Lancellotti did not issue any violations or provide any verbal recommendations; however, on May 19, 2021, FDEP issued Plaintiff three violations based on that inspection. *Id.* ¶¶ 74-75. Plaintiff called Lancellotti, who told him she knew the violations were not valid but that Plaintiff should resolve them anyway as a "good practice." *Id.* ¶ 75. Plaintiff resolved the violations and submitted all requested documents to FDEP to get back into compliance. *Id.* ¶ 76-77.

On September 1, 2021, Plaintiff, Andreotta, and Lancellotti had a conference call to address the outstanding violations. During the call, Andreotta advised Plaintiff that recording an inspection was unlawful, and Plaintiff was informed that the FDEP suspected he caused new discharges due to the increase in PERC and the septic tank samples. *Id.* ¶ 80-82.

Between November 1, 2021, and July 5, 2022, Plaintiff reviewed the site assessments and studies that Arcadis submitted to FDEP, and then called Arcadis employee Douglas McGlone to gain clarity on the studies. *Id.* ¶ 83. As Plaintiff began to ask questions, McGlone became "a bit agitated" and then said, "Those things don't matter, the real problem is they have a black business owner that didn't give them access. He's basically digging his own grave." *Id.* ¶ 84. Plaintiff interpreted that statement to mean that the difficulties he was encountering with Irwin and Lancellotti were racially motivated. *Id.* ¶ 85.

On December 1, 2021, Plaintiff received a Notice of New Discharge and Non-Compliance Issues, which accused Plaintiff of causing a new discharge of contamination and violating state laws. *Id.* ¶ 86. Then, on February 10, 2022, the FDEP issued Plaintiff an Official Notice of Violation, and on May 4, 2022, Plaintiff became aware of a criminal investigation that the FDEP had opened against him. *Id.* ¶¶ 87-88. Plaintiff contacted Kichler, an FDEP attorney, who informed him that the "sampling of MW003 and the sediment of the septic tank along with consultation from Arcadis were their basis for launching a formal enforcement effort and initiating a criminal investigation into Plaintiff." *Id.* ¶ 89. On May 18, 2022, FDEP acquired a search warrant and executed a search of the LSC Plant with ten police officers. *Id.* ¶ 90.

On July 5, 2022, Plaintiff emailed FDEP and various governmental entities that the LSC Plant was a DNAPL site and had been miscategorized and subsequently mishandled by Arcadis,

Earth Tech, and GPI, which caused the chemical spike in the groundwater samples. *Id.* ¶¶ 91-92. Then, on July 7, 2022, an independent firm, Alpha-Omega Training and Compliance ("AOTC"), was contracted to perform confirmatory sampling of the LSC Plant site. *Id.* ¶ 93. AOTC concluded that the site was a DNAPL site "and that a new discharge by Plaintiff was not possible given the evidence." *Id.*

Plaintiff alleges the spike of chemicals in the monitoring well MW003 was caused by Arcadis' and GPI's well development from December 2018 through January 2019, and that the pollution found in monitoring wells MW006-007 was caused by Arcadis' and Earth Tech's drilling in September 2020. *Id.* ¶¶ 94-95. These Defendants developed monitoring wells "in the heart of a DNAPL plume" and caused the pollution. *Id.* One indication that the wells were developed in a DNAPL zone is the sudden spike of chemicals in the next sampling following the development, which corresponds to Arcadis, GPI, and Earth Tech's work. *Id.* at ¶¶ 97-102.

## II.    LEGAL STANDARDS UNDER RULE 12(B)(1) AND 12(B)(6)

Federal Rule of Civil Procedure 12(b)(1) applies to challenges to a court's subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). In ruling on a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction, courts may consider matters outside the pleadings without converting the motion into one for summary judgment. *See* Fed. R. Civ. P. 12(d). When a defendant properly raises a factual challenge to subject matter jurisdiction under Rule 12(b)(1), "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of the jurisdictional issue." *Id.* at 925 (quoting *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)). When resolving a factual attack, the Court may look beyond the four corners of the complaint and consider extrinsic

evidence. *Id.*; *see also Colonial Pipeline Co. v. Collins*, 921 F.2d 1237, 1243 (11th Cir. 1991).

When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), this Court must accept all factual allegations in a complaint as true and take them in the light most favorable to the plaintiff; however, a plaintiff is still obligated to provide grounds of his or her entitlement to relief which requires more than labels, conclusions and a formulaic recitation of the elements of a cause of action. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 561-563 (2007). Unwarranted deductions of fact in a complaint cannot be admitted as true for the purposes of testing the sufficiency of the allegations. *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005). The facts as pled must state a claim for relief that is plausible on the face of the pleading. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-69 (2009).

## III.    ANALYSIS

### A.  Motions to Dismiss Under Rule 12(b)(1) for Eleventh Amendment Immunity

Arcadis asserts that the Court lacks subject matter jurisdiction over it because it is an arm of the state and entitled to Eleventh Amendment immunity. DE 77. GPI argues that because it performed work as a subcontractor of Arcadis, it is also entitled to immunity as an arm of the state. DE 86. "The Eleventh Amendment prohibits federal courts from exercising subject matter jurisdiction in suits brought against a state by a citizen of that state." *Schopler v. Bliss,* 903 F.2d 1373, 1378 (11th Cir.1990). The resulting immunity from suit in federal court extends to state agencies acting under the state's control. *Id.*; *Williams v. Dist. Bd. of Trs. of Edison Cmty. Coll.*, 421 F.3d 1190, 1192 (11th Cir. 2005) ("The law is 'well-settled that Eleventh Amendment immunity bars suits brought in federal court when an arm of the State is sued.'") (quoting *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003)); *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy,*

*Inc.,* 506 U.S. 139, 144 (1993). This immunity also bars both federal and state law claims against the agency. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). Eleventh Amendment immunity may be lost only if Congress abrogates a state's immunity or the state waives immunity for a certain type of suit. *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 54-56 (1995); *Hill v. Dep't of Corrections, State of Fla.*, 513 So. 2d 129, 131 (Fla. 1987).

Eleventh Amendment immunity may extend to an official or entity when it acts as "an arm of the state." *Lake v. Skelton*, 840 F.3d 1334, 1337 (11th Cir. 2016). When determining whether an entity is acting as an arm of the state, courts consider "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." *Id.* (quoting *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003)). "Analysis under *Manders* is function specific; in addition to determining the defendant's general status under state law, we also ask whether the defendant was acting as an arm of the state 'in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise.'" *Freyre v. Chronister*, 910 F.3d 1371, 1380 (11th Cir. 2018) (quoting *Manders*, 338 F.3d at 1308). Courts are "reluctant to extend state and governmental immunity to private entities simply because they perform governmental functions." *Edison v. Douberley*, 2008 WL 4194813, at *6 (M.D. Fla. Sept. 9, 2008) (citing various cases); *see also Rosario v. Am. Corrective Counseling Servs., Inc.*, 506 F.3d 1039, 1047 (11th Cir. 2007) ("The standard for Eleventh Amendment immunity has never been held to apply simply because an independent contractor performs some government function.").

1. <u>How Arcadis is Defined Under State Law</u>

The FDEP's contract with Arcadis provides that Arcadis "shall perform as an independent contractor and not as an agent, representative or employee of the [FDEP]" except for signing manifests for waste management. DE 77 at 27, 46. The term "independent contractor" is "legally significant" and, while not dispositive, "serves as persuasive evidence that [a contractor] did not act as an agent of the state under Florida law." *Freyre v. Chronister*, 910 F.3d 1371, 1381-82 (11th Cir. 2018). In *Freyre*, the Eleventh Circuit explained that "Florida statutes draw a distinction between 'independent contractors,' who are often solely liable for their actions, and 'agents,' to whom the state extends sovereign immunity. Florida case law states the point even more clearly." *Id.* (citing *Dorse v. Armstrong World Indus., Inc.*, 513 So. 2d 1265, 1268 (Fla. 1987)); *see also Rosario v. Am. Corrective Counseling Servs., Inc.*, 506 F.3d 1039, 1044-45 (11th Cir. 2007) (contract defining entity as an independent contractor rather than agent indicated entity was not arm of the state).

The contract also provides that Arcadis "has been determined to be a vendor to the [FDEP] under this Contract," further indicating that it is not an agent of the State DE 77 at 27. Arcadis ignores these contractual provisions and argues simply that because Arcadis contracted with FDEP as part of a statutory program, it must be defined as an arm of the state. DE 77 at 7. However, simply because the contract contemplates work to be performed pursuant to a statutory program or requirement does not mean the state defines the contractor as a governmental agency. Accordingly, this factor weighs against arm-of-the-state status.

2.   <u>Degree of Control the State Maintains Over Arcadis</u>

Arcadis argues that this factor is satisfied because it performed the work "directly pursuant to the Contract, and in furtherance of FDEP's statutory Program obligations" and cites various contractual provisions in support. DE 77 at 8-9. For example, Arcadis asserts that FDEP assigned work in its sole discretion, directed the requirements for sampling and analysis, determined if Arcadis performed services in a satisfactory manner, assumed ownership of any documents Arcadis created, specified which subcontractors could be used, and directed the manner in which Arcadis should maintain records. *Id.* However, there is no indication in Arcadis' argument or in the contract that FDEP maintains any control over Arcadis' day-to-day work or the specific ways in which Arcadis performs the work, nor does FDEP appear to supervise Arcadis' activities. DE 77-1. *See Rosario*, 506 F.3d at 1045 (state attorney's office required entity to use approved form letters but did not exercise other control over day-to-day activities, so the state did not maintain control over the entity for Eleventh Amendment purposes); *Isler v. Adelusola*, No. 08-cv-60257, 2008 WL 11409458 (S.D. Fla. Sept. 26, 2008) (state did not exert sufficient control over contractor for child placement services when the state did not have control over daily decision-making even though contractor was required to follow standards created by the state); *United States v. Fla. Birth-Related Neuro. Injury Comp. Ass'n*, No. 20-cv-13448, 2022 WL 1180142, at *5 (S.D. Fla. Apr. 21, 2022) (entity established by Florida legislature was not under state control for Eleventh Amendment purposes when it had autonomy over its day-to-day operations). Rather, the contract indicates the scope of work to be performed and leaves it to Arcadis to perform that work, with obligations and requirements that one might find in any contract. Further, the contract affords Arcadis discretion to reject any assignments and discretion in the way it completes projects and

work under the contract. Thus, this factor also weighs against finding that Arcadis is an arm of the state.

### 3. Where Arcadis Derives Its Funds

Arcadis does not receive funding directly from the state; rather, the state allocates funds for the Program, and Arcadis is paid an amount provided by contract for its work. DE 77. It argues, without providing any legal authority, that because the Florida legislature must appropriate funds for the Program, the third *Manders* factor is satisfied. The fact that FDEP pays Arcadis for its work through state-appropriated funds does lend support for Arcadis' position, but it is not dispositive of whether Arcadis is an arm of the state. *See Fla. Birth-Related Neuro.*, 2022 WL 1180142, at *6-7 (entity funded partially through legislative appropriations and also through voluntary assessments and investment income did not satisfy third *Manders* factor). Thus, this factor is neutral as to whether Arcadis may be considered an arm of the state.

### 4. Who Is Responsible for Judgments Against Arcadis

The Eleventh Circuit has stated that the most important factor in determining whether an entity is an arm of the state is whether the state treasury would be burdened by a judgment against the entity. *Freyre*, 910 F.3d 1371, 1384; *Rosario*, 506 F.3d at 1046. Arcadis argues that because the claims against it are solely related to its work on behalf of FDEP, this factor is satisfied. DE 77 at 10. However, it appears from the contract that a judgment would be paid either by Arcadis or by the liability insurance it is contractually obligated to purchase. DE 77 at 37 ("The Contractor shall secure and maintain during the life of the Contract comprehensive general liability coverage with limits of not less than $1,000,000 per occurrence and $2,000,000 annual aggregate for bodily injury and property damage"). The contract also contains an indemnification provision stating that

Arcadis "shall be fully liable for the actions of its agents, employees, partners, or subcontractors and shall fully indemnify, defend, and hold harmless the State" for actions arising from damage Arcadis causes. DE 77 at 101.  Arcadis asserts that this provision is irrelevant because FDEP has potential liability for Arcadis' actions and cites *Rosario* in support. DE 77 at 10 n. 4. However, the *Rosario* court rejected a similar argument and concluded that the indemnity provision in the contract at issue indicated that a money judgment against the contractor would not impose liability against the state. *Rosario*, 506 F.3d at 1046. Thus, this factor weighs against a finding that Arcadis is an arm of the state.

Considering all four *Manders* factors, the Court concludes that Arcadis is not an arm of the state for Eleventh Amendment purposes. While FDEP assumes some control over Arcadis' work in providing standards and expectations for the work, and pays Arcadis with state funds, the remaining facts strongly indicate that Arcadis is simply a contractor, including that the contract expressly defines Arcadis as an independent contractor, gives Arcadis discretion to perform its work and engage in its day-to-day management as it sees fit, allows Arcadis to reject assignments, and requires Arcadis to maintain liability insurance and assume liability for its work. To find that Arcadis is an arm of the state would essentially grant immunity to every entity that contracts with the state and receives payment from the state, which would render Eleventh Amendment immunity meaningless.

Because Arcadis is not an arm of the state, it follows that Arcadis' subcontractors Earth Tech and GPI also are not arms of the state.

**B. Arcadis' and Earth Tech's Motions to Dismiss for Lack of Standing**

Arcadis next argues that Plaintiff lacks standing because Plaintiff's Amended Complaint—which is ***not*** the operative complaint[2] in this case—alleges that his claims were assigned to him by his company, when that allegation is not present in the Second Amended Complaint.[3] DE 77 at 12. Arcadis argues that because this Court may consider evidence outside the pleadings when analyzing subject matter jurisdiction under *Lawrence v. Dunbar*, 919 F.2d 1525 (11th Cir. 1990), it should find that Plaintiff lacks standing based on an allegation from a previous pleading. However, Arcadis provides no authority for incorporating allegations from previous complaints into a Rule 12(b)(1) analysis, and the Court considers only the live pleading when considering whether Plaintiff has standing. Further, Plaintiff is suing on behalf of himself and the injuries he alleges he sustained personally and professionally as a result of Defendants' actions. Accordingly, at this stage of the litigation, the Court concludes that he has standing.[4]

In addition, Earth Tech argues that Plaintiff lacks standing because he only asserts state-law claims against Earth Tech and there is no common nucleus of operative fact linking the claims against Earth Tech to the federal claims against the FDEP individual Defendants. DE 79 at 3-4. However, Plaintiff alleges that the actions of Earth Tech in drilling are at least partly responsible for the violations he received from FDEP. As a result, the Court concludes there is a common nucleus of operative fact.

---

[2] Plaintiff's Second Amended Complaint, [DE 75], superseded his Amended Complaint, [DE 7]. *See Lowery v. Ala. Power Co.*, 483 F.3d 1184, 1219 (11th Cir. 2007) ("[A]n amended complaint supersedes the initial complaint and becomes the operative pleading in the case.").
[3] Earth Tech adopts Arcadis' argument by reference. DE 79 at 2 n. 1.
[4] Issues relating to standing and jurisdiction may be revisited at later stages of the litigation. *See Wuesthoff Health Sys., Inc. v. Health First, Inc.*, No. 05-cv-1454, 2007 WL 9719123, at *4 (M.D. Fla. Jan. 29, 2007).

**C.  Motions to Dismiss Under Rule 12(b)(6)**

All Defendants argue that the Second Amended Complaint should be dismissed under Rule 12(b)(6) because it constitutes a shotgun pleading and because it fails to state a claim under the applicable statutes.

1.  <u>Shotgun Pleading</u>

A shotgun pleading violates the requirement in Rule 8 of the Federal Rules of Civil Procedure that a pleading contain a short and plain statement of the claim showing that the pleader is entitled to relief.  *Vibe Micro Inc. v. Shabanets*, 878 F.3d 1291, 1294-95 (11th Cir. 2018); *see* Fed. R. Civ. P. 8(a)(2).  A shotgun pleading fails to some degree to give the defendants adequate notice of the claims against them and the grounds on which each claim rests.  *Vibe Micro*, 878 F.3d at 1295.

There are four basic categories of shotgun pleadings. *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321 (11th Cir. 2015).  First, a shotgun pleading contains "multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint." *Id.*  Second, a pleading is shotgun if it is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action."  *Id.* at 1322.  Third, a pleading is shotgun if it does not separate each cause of action or claim for relief into a different count.  *Id.* at 1323. Fourth and finally, a pleading is shotgun if it asserts "multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Id.*

The Eleventh Circuit has criticized shotgun pleadings as wasting scarce judicial resources, inexorably broadening the scope of discovery, wreaking havoc on appellate court dockets, and undermining the public's respect for the courts. *See Vibe Micro*, 878 F.3d at 1295; *see also Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1279 (11th Cir. 2006) ("Shotgun pleadings wreak havoc on the judicial system. Such pleadings divert already stretched judicial resources into disputes that are not structurally prepared to use those resources efficiently." (alteration and quotation marks omitted)).  Thus, the Eleventh Circuit has said that, even in cases where the parties do not raise a shotgun pleading issue, courts have a "supervisory obligation" to address shotgun pleading problems *sua sponte*. *Wagner*, 464 F.3d at 1275 ("Given the district court's proper conclusions that the complaint was a shotgun pleading and that plaintiffs failed to connect their causes of action to the facts alleged, the proper remedy was to order repleading *sua sponte*."); *see also Vibe Micro*, 878 F.3d at 1295 ("A district court has the inherent authority to control its docket and ensure the prompt resolution of lawsuits, which includes the ability to dismiss a complaint on shotgun pleading grounds." (quotation marks omitted)).

The Defendants all argue that the Second Amended Complaint is a shotgun pleading, including the following: (1) Arcadis and Earth Tech[5] argue that there are numbering defects that "cause complete confusion," that the Second Amended Complaint contains paragraphs regarding "wholly unrelated" events, incorporates the wrong paragraphs in the counts against Arcadis, and "incorporated Counts within Counts"; DE 77 at 14-18; (2) The FDEP Individual Defendants argue that Plaintiff asserts multiple claims against multiple defendants and that the Second Amended Complaint is replete with conclusory allegations; DE 78 at 5-6; and (3) GPI argues the Second

---

[5] Earth Tech incorporates by reference and adopts Arcadis' arguments. DE 79 at 10.

Amended Complaint is "confusing," "rambling," and lacks specificity regarding particular acts alleged against each Defendant. DE 86 at 6.

The Second Amended Complaint is not a model of clarity and does contain unnecessary and irrelevant information, but it is sufficient to comply with Federal Rules of Civil Procedure 8 and 10, particularly considering that Plaintiff is proceeding *pro se*, and provides fair notice to each Defendant of the facts alleged and claims asserted.  Five of the six Counts in Second Amended Complaint assert a claim against only one Defendant, and the remaining Count is a conspiracy claim, which necessarily is brought against multiple Defendants. While there are numbering problems in the Second Amended Complaint that may make it more difficult for each Defendant to study and analyze the specific claims, these defects do not rise to the level of causing "complete confusion" or making it impossible for the Defendants to understand what Plaintiff is alleging against them. Because the Second Amended Complaint provides "adequate notice" to Defendants, it does not constitute a shotgun pleading. *See Weiland*, 792 F.3d at 1323, 1325 ("A dismissal under Rules 8(a)(2) and 10(b) is appropriate where 'it is *virtually impossible* to know which allegations of fact are intended to support which claim(s) for relief.'") (emphasis in original) (quoting *Anderson v. Dist. Bd. of Trustees of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996)).

### 2.  Conspiracy Claim Under 42 U.S.C. § 1985 (Count V)

In Count V, Plaintiff asserts a claim for conspiracy to interfere with his civil rights under 42 U.S.C. § 1985(3),[6] alleging that Irwin, Lancellotti, and Andreotta, along with Arcadis, conspired to deprive Plaintiff of his rights under the Fourteenth Amendment. DE 75 at ¶¶ 162-70. To state a claim under § 1985(3), a plaintiff must allege (1) a conspiracy; (2) for the purpose of

---

[6] The Amended Complaint cites § 1985(c), which the Court construes as § 1985(3).

depriving any person of the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) harm the conspiracy caused. *Trawinski v. United Tech.,* 313 F.3d 1295, 1299 (11th Cir. 2002). The plaintiff must also allege that the conspiracy was "motivated by 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus.'" *Tilton v. Richardson,* 6 F.3d 683, 686 (10th Cir.1993) (quoting *Griffin v. Breckenridge,* 403 U.S. 33, 101-02 (1971)); *Dean v. Warren,* 12 F.4th 1248, 1257 (11th Cir. 2021). "That animus standard requires that the defendant proceeded on his course of conduct 'because of, not merely in spite of, its adverse effects upon an identifiable group.'" *Id.* at 1255 (citing *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 271-72 (1993)). "[T]he linchpin for [any] conspiracy is agreement, which presupposes communication." *Bailey v. Bd. of Cty. Comm'rs of Alachua Cnty.*, 956 F.2d 1112, 1122 (11th Cir. 1992). An agreement, however, may be inferred "from the relationship of the parties, their overt acts and concert of action, and the totality of their conduct." *Am. Fed'n of Labor and Congress of Indus. Orgs. v. City of Miami, FL,* 637 F.3d 1178, 1192 (11th Cir. 2011) (internal marks omitted). In sum, to state a claim, Plaintiff must allege facts that plausibly show Andreotta, Arcadis, Irwin, and Lancellotti reached an agreement to purposefully deprive Plaintiff of a specific right, they took steps in furtherance of the conspiracy, the conspiracy harmed Plaintiff, and the Defendants proceeded on their course of conduct because of Plaintiff's race.

Plaintiff's allegations fail to satisfy the elements for a conspiracy claim under § 1985(3). First, Plaintiff fails to allege that these four Defendants ever reached an agreement of any kind; rather, he describes various actions each Defendant took that he perceives as being indicative of a conspiracy. For example, Plaintiff alleges that Lancellotti performed an inspection and issued violations to Plaintiff that she knew were false, that Irwin kept Plaintiff in "Non-Compliance"

status despite knowing the violations had been resolved, and Irwin gave Plaintiff false information about when he may be placed back into compliance, with little additional detail. *Id.* ¶¶ 154-57. Arcadis participated in a conference call analyzing the spike in chemicals at the LSC-Plant site, and an Arcadis employee "recognized the conspiracy" and withheld unidentified "valuable and exculpatory" materials. *Id.* ¶¶ 158-59. Finally, Andreotta "knew or should have known" of the conspiracy because he participated in "the communication thread" prior to February 2022. *Id.* ¶ 160. *See Jackman v. 20th Jud. Cir. Ct. Admin.*, 2020 WL 3895425, at *3 (M.D. Fla. July 10, 2020) (allegations that defendants participated in a conspiracy and that listed a series of overt acts the defendants took failed to allege a factual basis showing an agreement were insufficient to state a § 1985 conspiracy claim); *Mickens v. Tenth Jud. Cir.*, 181 F. App'x 865, 876 (11th Cir. 2006) ("The core of a conspiracy claim is an agreement between the parties; thus, where the plaintiff fails to allege an agreement, the pleading is deficient and subject to dismissal," and a plaintiff must specifically allege an agreement between conspiracy defendants.).

Second, even if Plaintiff had alleged an agreement, he alleges no facts to support that any agreement was made for the purpose of depriving him of a constitutional right and does not identify the right he alleges was violated. Rather, Plaintiff alleges in a conclusory manner that the Defendants conspired to deprive him of equal protection in violation of the Fourteenth Amendment, and then suggests that Defendants targeted him when they should have pursued Arcadis for the environmental violations because Arcadis carries liability insurance while Plaintiff does not and because Arcadis allegedly caused the same damage at another, unrelated remediation site. *Id.* ¶¶ 163-69. Such conclusory allegations are insufficient to state a claim for a conspiracy or violation of a civil right. *See Smith v. Reg'l Dir. of Fla. Dep't of Corrections*, 3668 F. App'x 9,

12-13 (11th Cir. 2010) (citing *Fullman v. Graddick*, 739 F.2d 553, 556-57 (11th Cir. 1984)).

Further, to establish that the Defendants violated his right to equal protection under the laws, he must allege facts that he was treated differently than similarly situated individuals on the basis of his race. *See Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1305-06 (11th Cir. 2009); *Douglas Asphalt Co. v. Qore, Inc.*, 541 F.3d 1269, 1274-75 (11th Cir. 2008) (plaintiff's allegations that other government contractors were not subjected to the same testing procedures were conclusory and insufficient to state a claim); *Lindbloom v. Steube*, No. 8:10-cv-2108, 2011 WL 13175835, at *3-4 (M.D. Fla. Jan. 27, 2011) (plaintiff who alleged that government officials issued him warnings for trespassing but allowed others on the property did not state a claim for violation of his equal protection rights); *Wilson v. Boca W. Master Ass'n*, 2019 WL 1258789, at *3 (S.D. Fla. Mar. 18, 2019) (Plaintiff failed to allege that an employee engaged in similar conduct was treated differently). Here, Plaintiff fails to allege that these Defendants treated him differently from others responsible for contaminated sites; for example, there are no allegations that owners of other contaminated sites were not issued violations.

Third, the factual allegations Plaintiff makes in the Second Amended Complaint fail to support a claim that he was deprived of a right and indicate that the LSC Plant site was, in fact, contaminated and in violation of environmental regulations. DE 75. For example, Plaintiff does not contest the finding that there was a "new discharge" of contamination based on increased levels of chemicals in the groundwater and in septic tank samples, admits there was a spike in certain chemicals, and does not argue that the site was not contaminated; he simply attempts to shift the blame for the contamination away from himself. *Id.* ¶¶ 34, 82, 95-104. The facts alleged in the Second Amended Complaint support the issuance of violations: the LSC Plant site was

contaminated and discharged new pollution, FDEP officials identified the contamination and spike in chemicals, and FDEP officials cited Plaintiff based on that contamination. *See, e.g., Sokker v. Rizon E. Ass'n, Inc.*, 2017 WL 6371326, at *2-3 (S.D Fla. Dec. 13, 2017) (plaintiff failed to allege unlawful discrimination when allegations and attachments to complaint indicated disruptive conduct and supported non-renewal of her residential lease). The Second Amended Complaint also alleges that each Defendant was performing his or her job relating to the LSC Plant site—Arcadis performed site assessments and took samples; Lancellotti and Irwin conducted inspections, provided recommendations and advice, and reviewed Plaintiff's compliance status; and Andreotta explained FDEP policies and drafted correspondence.

Finally, Plaintiff alleges that the Defendants entered into the agreement "due to a mutual racial animus toward African Americans with a heightened dis[d]ain for those (African Americans) who are not subservient to their perceived authority to harm Plaintiff." DE 75 at ¶ 164. However, his only explanation for the racial animus is (1) that Irwin mispronounced his name with a derogatory slur and corrected her pronunciation when Plaintiff asked, and (2) a comment from an Arcadis employee that Plaintiff was "digging his own grave" as a "black business owner who didn't give [FDEP inspectors] access." *Id.* ¶ 84. Without more, these allegations are not enough to plausibly allege that the Defendants engaged in a conspiracy that was motivated by an "invidiously discriminatory animus," particularly in light of Plaintiff's failure to allege a conspiracy as discussed above. *Dean*, 12 F.4th at 1257. Accordingly, Count V is dismissed. The Court's dismissal is with prejudice for all of the reasons set forth in Subsection 4 below.

3. <u>Count IX – 42 U.S.C. § 1986</u>

In Count IX, Plaintiff asserts a claim for "Neglect to Prevent" under 42 U.S.C. § 1986 against Defendant Kichler, who is an in-house FDEP attorney.  DE 75 ¶¶ 171-79.  Section 1986 provides, in relevant part, "Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured . . . ." 42 U.S.C. § 1986.  A section 1986 action "is predicated on a successful conspiracy action under § 1985." *Moore v. Potter*, 141 F. App'x 803, 806-07 (11th Cir. 2005) (quoting *Morast v. Lance*, 807 F.2d 926, 930 (11th Cir. 1987)); *Farese v. Sherer*, 342 F.3d 1223, 1232 n.12 (11th Cir. 2003). To state a claim under § 1986, Plaintiff must allege that a person who has the power to prevent a § 1985 violation and has knowledge that the violation is about to occur neglects to prevent the violation. *Steeprow v. Bush*, No. 6:04-cv-1119, 2005 WL 1228285, at *6 (M.D. Fla. May 24, 2005) (citing *Tilton v. Richardson*, 6 F.3d 683, 686 (10th Cir. 1993)).  A section 1986 action "is predicated on a successful conspiracy action under § 1985." *Moore v. Potter*, 141 F. App'x 803, 806-07 (11th Cir. 2005) (quoting *Morast v. Lance*, 807 F.2d 926, 930 (11th Cir. 1987)); *Farese v. Sherer*, 342 F.3d 1223, 1232 n.12 (11th Cir. 2003) (where there is no underlying conspiracy under § 1985, the derivative § 1986 claim also fails).

Plaintiff alleges that Kichler knew he was experiencing discrimination and failed to intervene on Plaintiff's behalf. DE 75 ¶¶ 171-79. However, the Second Amended Complaint fails to allege sufficient facts to demonstrate Kichler knew of a conspiracy to deprive Plaintiff of his rights; rather, the allegations indicate Kichler reviewed materials, provided information to

Plaintiff, and received emails from Plaintiff about the treatment he was receiving from FDEP officials. *Id.* ¶¶ 89, 172-79. There are no factual allegations indicating Kichler knew that the other Defendants had an agreement to issue false violations to Plaintiff, or that Kichler had any power to stop them from issuing the violations. Further, because Plaintiff's claim under § 1985 fails, his claim under § 1986 necessarily fails. Therefore, Count VI is dismissed.  The Court's dismissal is with prejudice for all of the reasons set forth in Subsection 4 below.

<h3 style="text-align:center">4.   Dismissal of Counts V and VI With Prejudice</h3>

When a more carefully drafted complaint might state a claim for relief, a plaintiff generally must be given at least one chance to amend the complaint before a court dismisses the action with prejudice. *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001). A court need not allow amendment when (1) there has been undue delay, bad faith, dilatory motive, or a repeated failure to cure deficiencies by previously allowed amendments; (2) allowing amendment would cause undue prejudice to the opposing party; or (3) amendment would be futile. *Id.*

Here, the Court concludes that these factors support dismissal with prejudice, particularly the first and second factors.  First, Plaintiff has had three opportunities to file a complaint that states a claim, and was provided with extensive analysis and direction from the Court in its 40-page Order Granting in Part Motions to Dismiss, DE 74, as well as from Defendants in their motions to dismiss, yet Plaintiff failed to cure those deficiencies. *See* DE 26, 49, 54, 57, 62, 77-79, 86, 88-89, 92.; *Letourneau v. City of Pembroke Pines*, No. 17-cv-60082, 2017 WL 9362841, at *5 (S.D. Fla. Apr. 4, 2017) (second amended complaint dismissed with prejudice after plaintiff failed to cure deficiencies). Second, Defendants already have undergone two rounds of briefing on the motions to dismiss in which they filed lengthy motions and provided analysis on each of

Plaintiff's claims, and it would be prejudicial for the Defendants to be required to participate in a third round of extensive motion practice. *Colite Int'l Inc. v. Robert L. Lipton, Inc.*, No. 05-cv-60046, 2006 WL 8431656, at *6 (S.D. Fla. June 6, 2006) (Dismissing complaint with prejudice and explaining that "the Defendants in this matter have spent a large amount of time and money defending against poorly drafted pleadings. Defendants have a right to be free from such prejudice.") (citing *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 776 (7th Cir. 1994)). As a result, the Court concludes that Counts V and VI are dismissed with prejudice.

5.   Dismissal of Counts I-IV Without Prejudice

Because the Court is dismissing with prejudice Counts V and VI, the two federal claims in this lawsuit, only state-law claims, Counts I-IV, remain. The Court declines to exercise supplemental jurisdiction over these remaining state law claims. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . (3) the district court has dismissed all claims over which it has original jurisdiction."); *Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 743 (11th Cir. 2006).  Because Plaintiff did not file this action on the basis of diversity jurisdiction but, rather, on the basis of federal question jurisdiction, and because the Plaintiff and at least one of the remaining Defendants appear to be citizens of Florida, the Court can discern no basis for this case to remain in federal court. As a result, Counts I, II, III, and IV are dismissed without prejudice, and Plaintiff may elect to bring those claims in state court.

## IV.   CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** as follows:

1.   Defendants Kichler, Andreotta, Irwin, and Lancellotti's Motion to Dismiss Second Amended Complaint, [DE 78], is **GRANTED** and all claims against these

Defendants are **DISMISSED WITH PREJUDICE**.

2. Counts V and VI are **DISMISSED WITH PREJUDICE**.

3. Counts I, II, III, and IV are **DISMISSED WITHOUT PREJUDICE**.

4. This case is **CLOSED**, all deadlines are **TERMINATED**, and all remaining Motions are **DENIED AS MOOT**.

**DONE and ORDERED** in Chambers, West Palm Beach, Florida, this 3rd day of August, 2023.

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Copies furnished to Counsel of Record